**In re Andrew E. WILLIAMS, Debtor.**

**Andrew E. Williams, Plaintiff,**

**v.**

**Gelt Financial Corporation, Defendant.**

**Bankruptcy No. 98–35743DAS.**
**Adversary No. 98–0834.**

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

April 9, 1999.

Elizabeth Goodell, Community Legal Services, Inc., Philadelphia, PA, General Counsel for Debtor.

James D. Morris, Langsam, Stevens & Morris LLP, Philadelphia, PA, for Debtor in this Proceeding.

Howard Gershman, Blue Bell, PA, for Defendant.

Edward Sparkman, Philadelphia, PA, Standing Chapter 13 Trustee.

Frederic Baker, Philadelphia, PA, Assistant U.S. Trustee.

### OPINION

DAVID A. SCHOLL, Chief Judge.

A. *INTRODUCTION*

Presently before us is the disposition of an adversary proceeding ("the Proceeding") instituted by ANDREW E. WILLIAMS ("the Debtor") against GELT FINANCIAL CORPORATION ("the Defendant") to recover statutory damages for alleged disclosure violations of the federal Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.*, ("the TILA"), in two separate consumer loan transactions; to declare the attempted rescission of these transactions effective and obtain a broad range of remedies as a result of the Defendant's failure to properly respond to same; and to obtain damages under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1, *et seq.* (referenced herein by its generic designation as a law regulating *u*nfair and *d*eceptive *a*cts and *p*ractices, *i.e.,* "UDAP"). We hold that the

Defendant violated the TILA in the first transaction by failing to comply with the statute's advance disclosure requirements and by including prepayment penalties in "high cost" loans, and in taking a security interest against the Debtor's personally without its disclosure. We further hold that the Defendant presented inadequate evidence to rebut the Debtor's testimony that he failed to receive copies of any of the disclosure statements and notices relating to the second loan transaction. Therefore, we find that the Debtor is entitled to statutory damages and rescission of this transaction and all of the adverse consequences which flow to the Defendant from failing to honor this rescission.

One troublesome issue presented is determining what effect the Defendant's voluntary re-writing of the first transaction, allegedly to the Debtor's advantage, in the second transaction had upon the Debtor's claims for statutory damages and rescission in the initial transaction. We conclude that this action abated the Debtor's rescission rights in this transaction, but not his timely claims for statutory damages.

Therefore, we award the Debtor only the rather modest remedy of $2000 statutory damages from the first transaction. However, in light of his valid claims for rescission as well as statutory damages in the second transaction, we also award the debtor an additional $4000 statutory damages in, and invalidate the Defendant's security interest arising from, the second transaction. Although the Defendant's counsel is entitled to statutory attorneys' fees, no other remedies under the TILA nor any relief under UDAP are allowed, as the Defendant's failure to provide copies of the second transaction documents to the Debtor appears to be an unintentional and isolated occurrence.

## B. *PROCEDURAL AND FACTUAL HISTORY*

The Debtor filed the underlying individual Chapter 13 bankruptcy case on December 8, 1998. The instant Proceeding was filed on December 16, 1998, naming Gelt as the only defendant. The complaint recites eleven (11) counts, five seeking statutory damages for disclosure violations and the Defendant's failure to honor a rescission in regard to each of the transactions, plus a count based on UDAP. Although the Defendant filed a proof of claim in this case on December 11, 1998, well prior to the claims bar date of April 13, 1999, and the date of the initial confirmation hearing in this case on April 15, 1999, the Complaint does not directly attack or reference this proof of claim. *Compare In re Ralls,* 230 B.R. 508, 520–524 (Bankr.E.D.Pa. 1999) (in light of a claim attacking the defendant's proof of claim, this court, in another case involving a loan initially made by the same Defendant as is involved here, expended considerable efforts in attempting to measure the amount of the creditor's remaining claim). The claim is classified as secured by the Debtor's residence, referencing a total amount of $21,914.72 and arrearages of $3633.17.

After one continuance, the Proceeding was tried on February 23, 1999. Counsel pre-marked and agreed to the admission of over fifty (50) documents, most of which memorialized the two transactions at issue. Testimony was adduced from the Debtor on his own behalf. The Defendant called Joan McCartin, a closing agent of Thomas H. Baker Lawyers Land Services, and Theresa O'Brien, the Defendant's operations manager, as its witnesses.

The Debtor's testimony revealed that he is a 61–year–old divorced man, unsophisticated in financial affairs, who generally misunderstood the disastrous effect that these transactions had upon his financial status, and had a poor recollection or understanding of the specific terms of the transactions. He owns a single family home in Philadelphia, Pennsylvania, at 5169 Heston Street ("the Home"), where he currently resides, worth about $35,000,

which was unencumbered by any mortgages prior to the instant transactions.

The Debtor testified that, in December 1997, in response to a radio advertisement, he telephoned the offices of McGlawn & McGlawn ("McGlawn"), a loan broker firm, to obtain a loan to consolidate his outstanding unsecured indebtednesses. As a result, on December 17, 1997, the Debtor and the Defendant entered into a consumer loan transaction ("the First Transaction") brokered by and settled in the offices of McGlawn, in which the principal amount borrowed was for $18,200. As security for this loan, the Debtor signed a mortgage on the Home in favor of the Defendant. Although he readily admitted receiving copies of all requisite documents at the loan closing, the Debtor testified, and there is no evidence to the contrary, that he received no documents disclosing the terms of the First Transaction prior to December 17, 1997.

The Debtor's Loan Application nevertheless referenced a loan at a fixed interest rate of 17.990 percent, and the TILA Disclosure Statement presented to the Debtor reflects an interest rate of 20.243 percent. The parties apparently agree that the First Transaction was a "high cost" loan, as defined by 15 U.S.C. § 1602(aa), because the interest rate charged exceeded the United States Treasury yield rates for loans for a comparable period by more than ten (10%) percent, and because McGlawn received commissions exceeding $400. Also, the parties apparently agree that no monies were disbursed to the Debtor at the closing of the First Transaction, but that the loan principal was to be paid directly to the Debtor's creditors and a surplus of over $4800 was to be distributed to the Debtor at a later date.

The Debtor testified that, within two days after entering into the First Transaction, he telephoned McGlawn and informed its agent that he did not want to accept the loan because he believed that the interest rates, which he noted for the first time in reviewing the loan papers, were too high. Nevertheless, apparently ignoring this request, a McGlawn representative came to the Debtor's home and gave him copies of eight checks issued to his creditors by the Defendant in the total amount of $6211.31 and a check in the amount of $4854.20 payable to him. The Debtor now contends that checks payable to three of the creditors, totaling $528, were made out to entities which he did not owe. We note, however, that these payees are collection agencies, which in all likelihood represented actual creditors of the Debtor.

In February 1998, the Debtor contacted the Defendant by telephone and informed its agent that he had lost his job and was now totally unable to make payments on the First Transaction loan. The Defendant responded by offering to provide the Debtor with a "new loan" at a lower interest rate. Accordingly, on February 20, 1998, the Debtor and the Defendant entered into a second consumer loan transaction ("the Second Transaction"), also brokered by McGlawn and settled at its offices.

The principal of this loan was, again, $18,200, and the parties apparently agree that Second Transaction loan paid off or superseded the First Transaction loan. Once again, no disclosures were provided to the Debtor prior to the closing of the Transaction. However, with respect to the Second Transaction, the Debtor firmly maintained that, although he signed all the documents presented by the Defendant at the loan closing, no copies of any of these documents were provided to him. As to this particular issue, the Debtor testified at trial as follows:

Q. [by the Debtor's counsel] Mr. Williams, when you left this second loan signing were you given any documents?

A. [by the Debtor] No.

Q. You walked into the signing with no documents and when you left the signing you had no documents?

A. Correct, I had no documents.

Q. Let me be very specific about this. No copies of notes, mortgages, loan documentation?

A. No.

. . .

Q. [by Defendant's counsel on cross-examination] So even though you signed this document [an "Acknowledgment of Receipt of Documents"], it is your testimony you did not receive any documents at the second settlement?

A. [by Debtor] I didn't receive any documents at the second signing.

Q. So you pointed out to Ms. McCartin as the settlement clerk at that second settlement?

A. Correct.

Q. So if she testifies that she did give you the papers, she's not speaking the truth, is that accurate?

A. Correct.

At trial, the Defendant attempted to rebut the Debtor's contentions on this point with the testimony of McCartin. McCartin testified that it is her "habit" to make sure that all copies of documents are given to borrowers at loan closings at her title company and that there is no "reasonable possibility" that she did not give the Debtor copies of the relevant documents in the Second Transaction. However, McCartin's initially claimed that she did not go to the McGlawn office for this Transaction and only allowed, later in her testimony, that she "might have gone" there.

The Defendants other witness, O'Brien, did not claim to have attended the settlement and hence provided no testimony on the issue of receipt of documents at the closing. Instead, she provided a comparison between the two Transactions, explaining that only the First Transaction qualified as a "high cost" loan. She testified that the Defendant decided to pay off the first loan and write up the Second Transaction loan as a non-"high cost" loan because the Debtor was unable to pay off the First Transaction loan. She also produced a copy of a letter from the Defendant to the Debtor which purportedly enclosed a document which could have been used to satisfy the First Transaction mortgage, which the Debtor denied receiving.

We note that the February TILA Disclosure Statement does indeed reference a loan in the amount of $18,200 at a lower interest rate of 15.123 percent. The Second Transaction loan was also disclosed as secured by a mortgage on the Home. Also, we note that, at the Second Transaction closing, the Debtor returned to the Defendant the check for $4,854.20 obtained in the First Transaction. Most of the sums disbursed went to the Defendant to pay off the First Transaction loan.

Both transactions included a Balloon Note which reflected the Debtor's obligation to make a lump sum payment in early 2013. The First Transaction contemplated 179 payments of $ 274.14 and a January 1, 2013, balloon payment of $17,305.64. The Second Transaction featured 179 payments of $230.13 and a March 1, 2013, balloon payment of $16,672.22.

The Debtor, not having recovered his job, made no payments on the Second Transaction loan. On June 23, 1998, the Debtor, by his counsel's letter, sought to rescind both Transactions on the ground that the Defendant had violated the TILA, making specific reference to failures to accurately disclose the amount financed, the finance charge, and the annual percentage rate. The Defendant did not respond in any way to this letter prior to the lawsuit.

After the completion of the trial on February 23, 1999, the parties agreed that the Debtor's brief would be submitted by March 5, 1999, and that the Defendant would file its opposing brief by March 15, 1999. Shortly thereafter, the parties requested a one-week extension for both submissions. We note that the Defendant actually submitted its brief early, on March 19, 1999.

The submissions of the parties were of limited assistance to us. The Debtor ticks

off fifteen (15) alleged violations of TILA and UDAP by the Defendant, claiming, apparently oblivious to 15 U.S.C. § 1640(g), that each violation entitled him to separate statutory damages of $2000. Although *Ralls, supra,* is cited for the principle that valid rescissions which are not honored result in a number of remedies, the propriety of those remedies in relation to the specific facts of the instant Proceeding is not addressed. Neither the effect of the Defendant's payoff of the First Transaction loan nor the caselaw regarding the Debtor's critical claim of non-receipt of disclosures in the Second Transaction are advanced, either. Although a vague UDAP claim, based principally on the Debtor's "hopeless confusion" in the transactions, is referenced, the general integrity of the transactions as wise financial undertakings for the Debtor to make is not addressed. We note that the Debtor, through these transactions, has converted about $6200 unsecured debt, which incidentally would have been dischargeable in the bankruptcy which followed, into a secured obligation to pay approximately $230 for 15 years—payments totaling in excess of $33,000—at which time, the Debtor, at age 76, if he should live so long, would be confronted with a balloon obligation of over $16,670. We believe that no rational, well-advised similarly-situated person with any perspective for the future would ever enter into this or a like transaction.

The Defendant, in its reply brief, ignores the "big picture" of these Transactions and focuses, perhaps to create a distraction from that picture, on vigorously defending the numerous disclosure violations alleged to have occurred in the First Transaction. The Defendant also attempts to shrug off these violations as "moot" due to the payoff of the First Transaction. The Debtor's claim of non-receipt of the Second Transaction documents is countered by overstatement of McCartin's (non)-recollection of the terms of this Transaction and an equation of the Debtor's testimony on this issue of his non-receipt of these documents with his general lack of sophistication and confusion. Of course, the Defendant does not go as far as to say that, since no rational and well-advised person would have entered into either Transaction and the Debtor did so, he is irrational and not to be believed on any point. Although the general principles for resolution of the critical issue of receipt of the Second Transaction documents are recognized, the significant relevant caselaw is ignored as completely by the Defendant as by the Debtor.

## C. DISCUSSION

### 1. The Defendant Is Liable for the Timely–Challenged and Pervasive TILA Disclosure Violations in the First Transaction Documents.

The easiest issue to decide in the Proceeding is determining the Defendant's liability for TILA disclosure violations in the First Transaction. We note, at the outset, the fact that an affirmative action has been brought within the short one-year limitation period from the First Transaction established by 15 U.S.C. § 1640(e). The Defendant has offered no 15 U.S.C. §§ 1640(b) or (c) defenses. *Compare Ralls, supra,* at 517–521. We do note that the Debtor is limited to one $2000 statutory damage award under 15 U.S.C. § 1640(a)(2)(A)(iii) despite the multiple disclosure violations in this transaction by the terms of 15 U.S.C. § 1640(g).

As noted, the Debtor accurately contends that, in the First Transaction, the Defendant failed to provide the pre-closing disclosure of the interest rate, the monthly payments, and a warning about the possible loss of the Home, as required by the Home Ownership and Equity Protection Act of 1994, Pub.L. No. 103–325, 108 Stat. 2160 ("HOEPA"). The addition of the HOEPA requirements, contained in 15 U.S.C. § 1639 of the TILA, represents a Congressional determination that the disclosures previously required under TILA were insufficient to insure adequate notification to a consumer of the financial ramifications of high cost, nonpurchase money mortgages, as defined in 15 U.S.C.

§ 1602(aa). *See Newton v. United Companies Financial Corp.*, 24 F.Supp.2d 444, 450–451 (E.D.Pa.1998); and *United Companies Lending Corp. v. Sargeant*, 20 F.Supp.2d 192, 203 (D.Mass.1998). HOEPA thus placed new restrictions on lenders dealing in so called "high cost" mortgages by establishing additional "advance look" disclosure requirements and imposing limits on some potentially abusive substantive terms. These "advance look" requirements are in addition to the material disclosure requirements included in 15 U.S.C. § 1638(a) of the TILA. *See* 12 C.F.R. § 226.28(b).

As O'Brien conceded in her testimony, the HOEPA "advance look" disclosure requirements applied to the First Transaction. Accordingly, the Defendant had the affirmative duty to provide, at least three days prior to the consummation of the First Transaction, an "advance look" disclosure statement setting forth, among other things, the annual interest rate, the monthly payment, and a warning that, if the loan goes into default, the Debtor could lose the Home. *See* 15 U.S.C. §§ 1639(a)(1), 1639(a)(2), 1639(b); and 12 C.F.R. § 226.32(c). *See also Newton, supra*, 24 F.Supp.2d at 451. The testimony presented at trial established that the Defendant failed to provide these advance disclosures. In fact, the Defendant never rebutted the Debtor's testimony that no disclosures of any kind were provided by it to the Debtor prior to the settlement date of December 17, 1997.

The foregoing violations of the "advance look" disclosures are sufficient to trigger § 1640(a)(2) liability. *See* 15 U.S.C. § 1640(a). However, the Debtor further argues that by (1) providing pre-payment penalties; and (2) taking a security interest against certain of his personal property without disclosure, the Defendant further violated the TILA in this Transaction. *See* 15 U.S.C. § 1638(a)(9)(B), 1639(c).

The Defendant, at some length, argues that the Debtor's pre-payment penalties assert ions have no merit for several reasons. First, the Defendant argues that the TILA generally only precludes pre-payment penalties for "residential mortgage transactions," not consolidation loans like the instant loan. Next, it contends that the Alternative Mortgage Transaction Parity Act, 12 U.S.C. §§ 3801–3806 ("the Parity Act"), preempts the Pennsylvania's state-law prohibition against pre-payment penalties contained in 41 P.S. § 405. *See* 12 U.S.C. §§ 3803(c), 3804. Therefore, it contends that pre-payment penalties like the ones at hand were permissible in this Transaction. *See* 12 U.S.C. § 3802(1) The Defendant finally argues that, since the Regulations of the Office of Thrift Supervision ("OTS") govern this type of mortgage, the penalties in question were permissible because they are specifically allowed by the federal regulatory scheme. *See* 12 U.S.C. § 1462a; and 12 C.F.R. §§ 560.22, 560.34.

With respect to the Debtor's claims of inadequate description of its security interest, the Defendant invokes both the Uniform Commercial Code and Regulation Z. In making this argument, the Defendant, discussing the contents of a "1–4 Family Rider" ("the Rider") accompanying the First Transaction, which recites the security interests taken in issue, references only a security interest in the rents of the Home in addition to the Home itself included in the Rider. Since the Debtor never leased the Home nor collected rents therefrom, the Defendant contends that no property interest could have actually ever existed against which a security interest could have actually been enforced. *See* 13 Pa.C.S. § 9203. Further, the Defendant observes that the Commentary to Regulation Z notes that the definition of a "security interest" that must be disclosed excludes items of "incidental interests," *see* 15 U.S.C. § 1935(a)(25); and 12 C.F.R. § 226.18(m), and that, since the term "incidental interests" specifically includes assignments of rents, the undisclosed grant of the interest at issue does not result in a TILA violation.

■ However, with regard to the prepayment penalty issue, we find that

HOEPA placed new restrictions on lenders involved in "high cost" mortgages by imposing, among other things, established limits on several potentially abusive terms. One of these terms was prepayment penalties. *See* 15 U.S.C. § 1639(c)(1)(A); and 12 C.F.R. § 226.32(d)(6). We find that the specificity of HOEPA in addressing this subject as to all "high cost" loans prevails over the more general restrictions of penalties to "residential mortgage transactions," the provisions of the Parity Act, or the statements in OTS Regulations.

With respect to the disclosure of security interests, the Defendant fails to note that, while the Disclosure Statement references a security interest in "real property" only, the Rider includes a security interest in

> building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings now or hereafter attached to the Property, all of which, including replacements and additions thereto,

as well as providing for a security interest in rents.

Thus, the Rider effects a security interest in virtually all of the Debtor's household goods as well as any possible rents obtained from the Home. The Disclosure Statement, meanwhile, never mentions a word about the taking of a security interest in any of the Debtor's personal property or future possible rents. Since the Disclosure Statement fails to indicate that a security interest will be taken in property that is in fact covered by the mortgage note, the Disclosure Statement is significantly under-inclusive and hence does not conform to the TILA requirements. *See In re Clarke,* 1991 WL 17872, at *3 (Bankr.E.D.Pa. Feb. 12, 1991); *In re Lyons,* 1990 WL 153573, at *2 (Bankr. E.D.Pa. Oct. 12, 1990); *In re Draper,* 1990 WL 142475, at *6 (Bankr.E.D.Pa. Sept. 28, 1990); *In re Bender,* 86 B.R. 809, 814–815 (Bankr.E.D.Pa.1988); *In re Caster,* 77 B.R. 8, 11–12 (Bankr.E.D.Pa.1987); and *In re Dangler,* 75 B.R. 931, 934 (Bankr. E.D.Pa.1987).

■ We find no merit in the Defendant's contention that no property interest ever existed against which a security interest would have been actually enforced, or that the failure to disclose an "incidental interest" in rents alone does not result in a TILA violation. A creditor's failure to reveal in a disclosure statement the full nature of its potential security interests taken in a loan transaction violates the TILA even if security interest is not perfected. See *Caster, supra,* 77 B.R. at 12; and *In re Cervantes,* 67 B.R. 816, 818 (Bankr.E.D.Pa.1986).

The Defendant has therefore committed at least three separate TILA disclosure violations in the First Transaction. The only issue of same uncertainty is the effect of same, given the incidence of the Second Transaction.

2. *Although the Defendant's TILA Violations in the First Transaction Would Ordinarily Trigger a Right to Rescind That Transaction as Well as to Statutory Damages, the Complete Supersession of the First Transaction by the Second Transaction Eliminates the Potential for Rescission and the Penalties for the Defendant's Failure to Properly Respond to the Debtor's Attempted Rescission, If Not the Statutory Damages.*

■ We previously noted that the Defendant not only failed to comply with

several of the "old" TILA disclosure requirements, but completely disregarded the new HOEPA provisions in making disclosures for rescission purposes. The violations of HOEPA's disclosure requirements are expressly deemed a failure to deliver the "material disclosures" mandated by TILA. *See* 15 U.S.C. § 1639(j); and *Newton, supra,* 24 F.Supp.2d at 451. Similarly, a creditor's failure to set forth in the disclosure statement the exact nature of the security interest taken triggers the TILA rescission provisions. *Cervantes, supra,* 67 B.R. at 818. *See also Thomka v. A.Z. Chevrolet, Inc.,* 619 F.2d 246, 250 (3d Cir.1980).

■ Nevertheless, the First Transaction was fully paid off by the Second Transaction incurred on February 20, 1998, as evidenced by the mortgage satisfaction piece allegedly forwarded to the Debtor by the Defendant. Thus, the question before us is whether the Debtor was entitled to rescind the First Transaction in June 1998 and whether the consequences of the Defendant's failing to properly act on a valid rescission, *see* pages 642–643 *infra;* and *Ralls, supra,* at 520–524, were abated by the occurrence of the Second Transaction.

Paying off a loan is not listed in the TILA or Regulation Z as a basis for termination of the right of rescission. *See In re Abele v. Mid–Penn Consumer Discount,* 77 B.R. 460, 467 (E.D.Pa.1987), *aff'd,* 845 F.2d 1009 (3d Cir.1988). *See also Etta v. Seaboard Enterprises, Inc.,* 674 F.2d 913, 919 (D.C.Cir.1982); *In re Wright,* 127 B.R. 766, 770 (Bankr.E.D.Pa.), *aff'd,* 133 B.R. 704 (E.D.Pa.1991); and E. Griffith, *Truth in Lending—Rescission and Disclosure Issues in Closed–End Credit,* 17 NOVA L.REV. 1253, 1279 (1993) In *Abele* the debtors engaged in eight consumer loan transactions with the same lender. 77 B.R. at 465. Each prior transaction was canceled by the next. *Id.* When the debtors exercised their rights to rescind all eight transactions under the TILA, the lender argued that the debtor's right of rescission no longer existed as to the first seven transactions, as those prior loans were paid in full through each new transaction. *Id.* at 467. The *Abele* court disagreed. The court observed that the *Abele* lender had failed to take any action "necessary or appropriate to reflect the termination of any security interest created under each transaction." *Id.* Thus, the court concluded that, "[a]s long as the mortgages created in connection with those loans remained in effect, the sine qua non for the right of rescission still existed." *Id.*

However, we find the facts in *Abele* distinguishable from those at bar. In the instant case, the Defendant completely removed the lien obtained through the First Transaction by extinguishing the security interest taken against the Debtor's Home, as evidenced by the mortgage transaction piece. Moreover, it completely re-wrote the First Transaction, rather than building on it, as did the refinancings in *Abele.* We further note that, upon making a valid voluntary rescission of a transaction, a lender must not only remove the lien on the property, but also it must return any money or property that the consumer has given to it. *See* 15 U.S.C. § 1635(b); and 12 C.F.R. § 226.23(d)(2). However, the Debtor in the instant Transaction failed to make any payments required before the termination of the First Transactions loan, and hence did not pay any finance or other charges to the Defendant. The instant facts therefore present the apparently rare instance where there is nothing else left for the lender to do to effect a rescission other than satisfy the mortgage taken. Therefore, we find that, here, the Debtor's right to rescind the First Transaction no longer existed as of June 1998.

■ Despite this conclusion, we cannot overlook the fact that the Defendant committed disclosure violations in the First Transaction and that these cannot be righted by a voluntary or involuntary rescission. *See Newton, supra,* 24 F.Supp.2d at 451; *In re Wright,* 133 B.R. 704, 710, (E.D.Pa.1991); *Abele, supra,* 77

B.R. at 469–470; *Aquino v. Public Finance Consumer Discount Co.,* 606 F.Supp. 504, 510–511 (E.D.Pa.1985); and *In re Steinbrecher,* 110 B.R. 155, 166–167 (Bankr.E.D.Pa.1990). Since the violations at issue arise under §§ 1638(a)(9), 1639(a), 1639(b), and 1639(c)(A), the Debtor is entitled to be awarded $2,000 in statutory damages, plus attorneys fees, 15 U.S.C. §§ 1640(a)(2)(A)(iii), (a)(3), in connection with the First Transaction.

Our holding that the Debtor's damages are limited in connection with the First Transaction may provide a more realistic explanation as to why the Defendant was so willing to enter into the Second Transaction with the Debtor despite its provisions allegedly less beneficial to the Defendant than the philanthropic motivations suggested by O'Brien. The Defendant may well have noticed its extensive TILA violations on the First Transaction, particularly its failure to provide the "advance look" disclosures to the Debtor. The Second Transaction may have been motivated by an attempt by the Defendant to protect itself from exposure to liability due to a rescission. It also may have simply been an effort to "flip" the loan transaction shortly after the original transaction was made, improving the Defendant's overall position. The presence of sequential loans is one feature in common with the *Ralls* transactions. *See Ralls,* at 513–514.

As noted above, the Defendant did not allege any attempts to invoke the corrective provisions of 15 U.S.C. § 1640(b). Likewise, it did not undertake to prove the elements of 15 U.S.C. § 1640(c). The same Defendant was unable to prevail in such efforts in *Ralls, supra,* at 517–521.

Rather, it appears that the Defendant chose to patch up the loan and make a little less of a killing in the Second Transaction than it had made in the First Transaction. However, this was really not so when the Transactions were considered as a unit. As we noted in comparing the provisions of the two loans at page 634 *supra,* the changes in the Transactions were not really very significant. The proceeds actually paid out in the Second Transaction were *diminished* by the Debtor's return of the funds distributed to him in the First Transaction. The balloon payment which the Debtor was required to make, while slightly less, was equally an unattainable from the Debtor at age 76 as that required in the First Transaction. The monthly payments were reduced from over $274 monthly to about $230, but the term of fifteen (15) years retained constant. To the unemployed Debtor, his payment potential was equally as slim. In sum the Defendants "cleaned up" its errors in the First Transaction by entering into the Second Transaction, but provided very little actual help in the way of a life-preserver to the financially-drowned Debtor. When the two Transactions are considered as a unit, they placed the Debtor in a most disadvantageous position.

*3. The Failure of the Defendant to Effectively Rebut the Debtor's Credible Testimony That He Failed to Receive Copies of the Disclosure Forms and Rescission Notice Form in the Second Transaction Entitles the Debtor to both Statutory Damages and Rescission of the Second Transaction.*

 Unfortunately, for the seemingly well-conceived plan of the Defendant to limit its exposure and engage in a series of its most advantageous dealings with the Debtor, it made a fatal mistake. It failed to insure that copies of the disclosure statements and the notice of his right to rescind the Second Transaction were provided to the Debtor. As 12 C.F.R. § 226.17(a) makes particularly clear, all TILA disclosures must be made "clearly and conspicuously in writing, in a form that the consumer may keep." There is thus little doubt that failure to provide a consumer with a copy of the requisite TILA disclosures manifests a failure to "disclose," as is required in the case of all of the information called for by 15 U.S.C. § 1638. *See Shepeard v. Quality Siding & Window Factory, Inc.,* 730 F.Supp. 1295,

1300–1302 (D.Del.1990); *Jenkins v. Landmark Mortgage Corp.*, 696 F.Supp. 1089, 1093–1094 (W.D.Va.1988); and *Steinbrecher, supra,* 110 B.R. at 164.

Clearly, a failure to provide copies of the notice of the Debtor's right to rescind to him constituted a violation of 15 U.S.C. § 1635(a). Were there any doubt concerning this point, 15 U.S.C. § 1635(c), cited by the Defendant in its brief, provides as follows regarding the burden of proof on this issue:

> Notwithstanding any rule of evidence, written acknowledgment of receipt of any disclosures required under this title by a person to whom information, forms, and a statement is required to be given pursuant to this section does no more than create a rebuttable presumption of delivery thereof.

Likewise, there can be little doubt that a failure to properly "disclose" any terms of a transaction, as well as the failure to provide the requisite notice of the "material violations" of the TILA, *see* 15 U.S.C. § 1602(a), entitles a consumer to rescission of this Transaction under 15 U.S.C. § 1635(a) if the request for the rescission is made within three years from the date of the Transaction. *See* 15 U.S.C. 1635(f).

Although lack of receipt of TILA disclosures thus provides a consumer with a sure-fire basis for claiming rescission as well as statutory damages, cases addressing such allegations of lack of receipt of requisite disclosures are rather rare. Successful cases include this court's decisions in *In re Herbert,* 86 B.R. 433, 438–439 (Bankr.E.D.Pa.1988), *rev'd in part on other grounds sub. nom. Herbert v. Federal Nat'l Mortgage Ass'n,* 102 B.R. 407 (E.D.Pa.1989); and *In re Pinder,* 83 B.R. 905, 912–914 (Bankr.E.D.Pa.1988); and *In re Underwood,* 66 B.R. 656, 661–664 (Bankr.W.D.Va.1986). Cases where such a claim was rejected include our decisions in *Caster, supra,* 77 B.R. at 14; and *In re Johnson–Allen,* 67 B.R. 968, 970 (Bankr. E.D.Pa.1986); and *In re Rhoades,* 80 B.R. 938, 940–942 (Bankr.C.D.Ill.1987).

In none of these cases, including the successful cases, was the evidence of non-receipt of disclosures as stark and direct as it is here. Most of these cases presented situations where the consumers claimed that the disclosure statement or the notice to rescind simply was not to be found. In *Pinder,* for example, the debtor claimed that she was unable to locate a disclosure statement among the "stack of papers" provided to her at settlement on her home. 93 B.R. at 912. No disclosure statement was produced. Although the debtor "claimed not to know if a disclosure statement was given or not," *id.,* and her testimony of non-receipt "was not totally convincing," *id.* at 913, we nevertheless held in her favor on this issue, reciting the applicable law, at *id.,* as follows:

> It is generally held that a lender bears the burden of providing compliance with the requirements of the TILA. *Wright v. Tower Loan of Mississippi, Inc.,* 679 F.2d 436, 444 (5th Cir.1982); *Super Chief Credit Union v. Gilchrist,* 232 Kan. 40, 653 P.2d 117, 122 (1982); and *Rainey v. Credithrift of America # 5, Inc.,* 441 So.2d 278, 280 (La.App. 1983). Where the creditor has produced an acknowledged copy of a TILA Disclosure Statement, the burden is on the consumer to prove non-receipt. 15 U.S.C. § 1635(c); *Fort v. First Citizens Bank & Trust Co.,* 526 F.Supp. 22, 29 (M.D.N.C.1981); and *McCarrick v. Polonia Federal Savings and Loan Ass'n,* 502 F.Supp. 654, 657 (E.D.Pa.1980). However, the unrebutted testimony of a debtor may be sufficient to support a finding that the required TILA disclosures were not given, even where a disclosure statement is produced. *In re Underwood,* 66 B.R. 656, 662 (Bankr. W.D.Va.1986) (footnote omitted).

The facts of *Herbert* were much the same as those of *Pinder.* The consumer simply testified that "she could not locate a TILA disclosure statement in the midst of the 'stack of papers' she received at settle-

ment." *Id.* at 438. However, the claim was upheld.

*Rhoades* reached the opposite result. There, the debtors admitted receiving numerous papers, including TILA disclosures, in connection with the transaction at issue, but alleged that they had not received the crucial notice of the right to rescind relative to the particular transaction at issue. 80 B.R. at 940. The defendant presented testimony regarding its usual practice of providing the notice. *Id.* Holding that "[s]omething more" than the consumer's testimony of non-receipt was required to successfully claim non-receipt of disclosures, *id.* at 941, the court ultimately ruled against the debtors because of earlier testimony that they had admittedly disposed of papers related to other loans and found other papers while preparing for trial. *Id.* at 942. In *Caster, supra,* 77 B.R. at 14, and *Johnson–Allen, supra,* 67 B.R. at 970, we refused to accept the mere absence of disclosure statements, plus debtors' respective uncertain testimony of a lack of memory of a receipt of documents, as sufficient to establish liability for non-receipt of documents in these cases.

The testimony of the instant Debtor is evidence of a higher quality regarding the absence of requisite disclosures than the evidence presented in any of the foregoing cases. The Second Transaction occurred about a year prior to the testimony and hence was fresh in the Debtor's mind. The Debtor's testimony of non-receipt was positive, unqualified, and a direct contrast to his candid statement that he received all of the requisite disclosures at the settlement of the First Transaction. There was no evidence that he ever disposed of any documents given to him or located others at a later time.

The Defendant countered the Debtor's testimony with the testimony of McCartin and production of the documents themselves. As the Debtor admitted, an "acknowledgment of receipt" of at least the notice of his right to rescind was signed by

him. However, 15 U.S.C. § 1635(c) expressly limits the effect of such a written acknowledgment to "no more than … a rebuttable prescription of delivery" of the notice. We think that § 1635(c) suggests that the *Rhoades* court was perhaps mistaken in requiring "something more" than a consumer's testimony of non-receipt to stand as rebuttal. It is not clear what else a consumer *could* present to "prove the negative" of non-receipt other than testimony of same. We find the Debtor, unlike the *Pinder* debtor whose claim was nevertheless upheld, to be totally convincing on this point. We note that, while confused by the terms of these transactions, as exemplified by his willingness to enter into them, the Debtor appeared not to be confused at all as to where the transaction occurred and his non-receipt of the relevant papers.

Meanwhile, the testimony of McCartin, while credible as far as it went, *was* confused over the very basic issue of where the transaction occurred. We have no doubt that McCartin meant to provide the Debtor with copies of the relevant papers, nor do we doubt that she typically does so. Clearly, the Defendant, in light of the consequences of same, had no incentive to fail to provide the Debtor with copies of the papers documenting the Second Transaction. However, the evidence is, if anything, stronger than that presented in *Pinder, Herbert,* and *Underwood* that it failed to do so in the Second Transaction.

We therefore conclude that, due to the Debtor's failure to receive copies of any of the relevant TILA disclosures or the notice of his right to rescind in connection with the Second Transaction, the Defendant must be held to have violated the disclosure requirements of the TILA, and has provided the Debtor with valid grounds to rescind this Transaction.

*4. None of the Other Claims Asserted by the Debtor Have Any Merit.*

■ At this point, we shall address briefly the Debtor's additional claims, all of

which we conclude lack merit. In each transaction, the Debtor cites *Ralls, supra,* for the principle that the "starkly different" terms of the like transactions created confusion on his part for which the Defendant is presumably responsible and liable. However, we disagree that the two loan Transactions are really so different. We also agree with the Defendant when it argues that it was not its burden under the TILA or UDAP to prove that it eliminated all confusion in the mind of the Debtor in reference to these transactions. It is our view that no clear-thinking person would have entered into either of these transactions, or anything like them. However, that is not the point. In *Ralls* the consumer was provided with inconsistent disclosures regarding the *same* transaction. *See Ralls,* at 514–517. While this was improper, it is *not* improper for a lender to provide different disclosures to a consumer in relation to two different transactions. It is also not required that the consumer understand the disclosures provided, but only that they be properly made pursuant to the terms of the TILA.

The Debtor also complains that certain of the distributions of proceeds were made to parties whom he does not now recognize as his former creditors. As we noted at page 633 *supra,* however, it is likely that these payees are collecting agents for legitimate creditors of the Debtor. The disputed payments were made in connection with the First Transaction. The Debtor provided no evidence of any protests to the Defendant or to McGlawin disputing the distributions, even though he testified that he examined the First Transaction papers clearly enough to ascertain that the interest rate in this Transaction was excessive. We thus find that it is too late for the Debtor, in the course of this litigation to, for the first time, make meaningful claims of erroneous distributions of the proceeds of the First Transaction loan.

The Debtor also posits that he was entitled to the HOEPA "high cost" loan disclosures in connection with the Second

Transaction, specifically referencing the "advance look" pre-closing disclosures required by 15 U.S.C. § 1639. However, since the Second Transaction was carefully crafted by the Defendant to fall just outside the 15 U.S.C. § 1602(aa) definitions, per the testimony of O'Brien, no such disclosures were required.

The Debtor has added a UDAP claim. However, little effort is made by the Debtor in his Complaint or his brief to explain the nature of this claim except reiteration of the Debtor's "hopeless confusion" in the Transactions and the alleged improper distribution of the proceeds, subjects which we discussed at pages 641–642 *supra.* To state a viable UDAP claim a consumer must establish the defendant's fraudulent conduct or, "[a]t the very least, ... that the Defendants engaged in 'pervasive illegal conduct' to state a cause of action under UDAP." *In re Zisholtz,* 226 B.R. 824, 831 (Bankr.E.D.Pa. 1998), citing *In re Smith,* 866 F.2d 576, 581 (3d Cir.1989); and *In re Milbourne,* 108 B.R. 522, 534 (Bankr.E.D.Pa.1989).

There is no evidence that the TILA violations which were upheld by this court are pervasive in the Defendant's course of business. Indeed, the failure to provide the Debtor with TILA disclosure documents which constituted the Second Transaction violation was, in our view, most unusual, comparable to the Debtor's hitting the lottery. What is possibly pervasive is the Defendant's lack of concern that its practices saddle low income, unsophisticated consumers with unreasonable financial burdens. Such practices appear endemic to the Defendant's business. *Compare Ralls, supra,* at 512–515. There is, however, insufficient evidence on this score on this record to support the conclusion that the Defendant's general business practices constitute a UDAP violation.

Finally, the Debtor irritatingly cites *In re Galloway,* 220 B.R. 236 (Bankr.E.D.Pa. 1998); and *In re McMillan,* 182 B.R. 11 (Bankr.E.D.Pa.1995), for the principle that the Defendant is obliged to prove the cor-

rectness of its distributions to the Debtor's alleged former creditors. In fact, both of these decisions involve challenges to proofs of claim, which the Proceeding, perhaps erroneously, fails to include among its numerous counts. Both hold that certain components of proofs of claims, such as attorneys' fees or costs which are challenged by a consumer as not legitimate, are not allowable unless proven. *See Galloway, supra,* 220 B.R. at 244; and *McMillan, supra,* 182 B.R. at 14–15. We do not believe that the instant Defendant is, by authority of these cases, obliged to prove the validity of the distributions to support claims that certain of the loan proceeds were properly advanced. *See also* page 642 *supra* (Debtor should have raised the issue of improper distributions at an earlier stage).

5. *The Debtor Is Entitled to Statutory Damages of $6000 and Declarations that the Defendant's Claim Is Unsecured and That His Counsel Is Entitled to Reasonable Attorneys' Fees and Costs.*

█ In *Ralls, supra,* at 520–524, we set forth at length the law and general considerations pertinent to framing remedies when valid TILA rescission demands are ignored by creditors. One clear effect is termination of the security interest taken in the consumer's residence in the transaction. *See id.* at 521–522, citing, *inter alia,* 15 U.S.C. § 1635(b); and 12 C.F.R. § 226.23(d)(1). The Defendant's claim, insofar as it purports to be secured by the Debtor's Home, must accordingly be reclassified as an unsecured claim.

█ Second, the Debtor is entitled to statutory damages. *See Ralls, supra,* at 522–523, and cases cited therein. The Defendant is liable for $2000 on account of its timely disclosure violations in each of the transactions, plus an additional $2000 for failing to properly respond to the Debtor's valid rescission of the Second Transaction. We will require that this $6000 total sum be paid to the Trustee until it can be determined whether all or most of this sum are exempt assets.

Since the Defendant's proof of claim is not directly challenged in the Proceeding, it would be inappropriate, at this juncture, for us to determine the precise allowable amount of the Defendant's claim by deducting any recoupments or disallowable finance charges therefrom. *Compare Ralls, supra,* at 522–524. We note that the Debtor's Chapter 13 Plan, filed December 18, 1998, contemplates payments of but $5.00 monthly, or a total of $180.00, to the Trustee to distribute on all claims. The distribution to unsecured creditors, which is to be *pro rata* after payment of all secured and priority claims, is thus likely to be non-existent or at best nominal. Ascertainment of the amount of the Defendant's allowable unsecured claim by therefore not be worth the effort for either party or this court.

No payments were made by the Debtor on the loan, so none can be returned to the Debtor. *See Ralls, supra,* at 522–524, and cases cited therein. Wiping out the Defendant's claim or forcing any kind of repayments to the Debtor was neither requested by the Debtor nor appears appropriate in light of his lack of payments. *See id.*

█ The Debtor's counsel are entitled to their reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1640(a)(3). As in *Ralls, supra,* at 524, we will urge the parties to attempt to amicably resolve this issue before allowing a fee application to be filed.

### D. CONCLUSION

The following Order is entered to enforce the conclusions reached in this Opinion.

### ORDER

AND NOW, this 9th day of April, 1999, after a trial of the above-captioned proceeding on February 23, 1999, and upon consideration of the parties' respective

timely post-trial submissions, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of ANDREW E. WILLIAMS ("the Debtor") and against GELT FINANCIAL CORPORATION ("the Defendant") in substantial part, as described in the foregoing Opinion.

2. It is DECLARED that the Debtor properly exercised his right to rescind the parties' loan transaction of February 20, 1998, and that therefore this transaction is deemed properly rescinded by the Debtor.

3. The Defendant is forthwith directed to satisfy any remaining mortgages which it had previously taken against the Debtor's residential real estate at 5169 Heston Street, Philadelphia, Pennsylvania 19131.

4. The Defendant shall forthwith pay the sum of $6000 to Edward Sparkman, the Standing Chapter 13 Trustee ("the Trustee"), as damages pursuant to 15 U.S.C. § 1640(a)(2)(A)(i). The Trustee shall determine whether this sum may be claimed as part of the Debtor's exemptions, and, if it may be, he shall forward this sum to the Debtor forthwith.

5. The parties are urged to attempt to agree upon reasonable attorneys' fees and costs which are due to the Debtor's counsel, pursuant to 15 U.S.C. § 1640(a)(3). If this matter is not resolved within fifteen (15) days, the Debtor's counsel may, within thirty (30) days of this order, file motions requesting court awards of such fees, said motions to be procedurally in conformity with Local Bankruptcy Rule 2016.3. However, if the Debtor's counsel have made reasonable requests for such fees which are refused, said counsel may recover compensation for time spent in preparing their respective fee applications.

6. The hearing on confirmation of the Debtor's Chapter 13 Plan in his main bankruptcy case remains scheduled on THURSDAY, APRIL 15, 1999, AT 9:30 A.M. and shall be held in Bankruptcy Courtroom No. 1, Second Floor, 900 Market Street, Philadelphia, PA 19107.

7. The Debtor, by his counsel, is directed to indicate what steps he plans to take to obtain confirmation of a Chapter 13 plan in light of this decision at that hearing.