**Andrew WILLIAMS**

v.

**GELT FINANCIAL CORPORATION.**

No. Civ.A. 99–2371.

United States District Court, E.D. Pennsylvania.

Aug. 10, 1999.

Elizabeth Goodell, Community Legal Services, Inc., Philadelphia, PA, James D. Morris, Langsam, Stevens and Morris, LLP, Philadelphia, PA, for Andrew Williams, debtor.

Howard Gershman, Heller, Kapustin, Gershman and Vogel, Blue Bell, PA, for Gelt Financial Corporation.

Edward Sparkman, Philadelphia, PA, trustee pro se.

Frederic Baker, Philadelphia, PA, trustee pro se.

## MEMORANDUM

BARTLE, District Judge.

Plaintiff Andrew Williams ("Williams") filed for bankruptcy under Chapter 13 of the Bankruptcy Code. 11 U.S.C. § 1301 *et seq.* In the bankruptcy court, he brought an action against Gelt Financial Corporation ("Gelt") seeking, among other relief, damages based on violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and a declaration that his rescission of the loan from Gelt was effective. The matter was tried before a bankruptcy judge. Pursuant to 28 U.S.C. § 158(a), Gelt has appealed the bankruptcy court's order of April 9, 1999. It provided that: (1) Williams properly rescinded his February 20, 1998 loan from Gelt; (2) Gelt must pay $6,000 for various statutory violations; and (3) Gelt owes Williams reasonable attorneys' fees. We follow the "clearly erroneous" standard for all factual determinations and the de novo standard for the court's legal conclusions. *In re Siciliano*, 13 F.3d 748, 750 (3d Cir.1994).

The following facts are undisputed. On December 17, 1997, Williams obtained a loan ("the first transaction") in the principal amount of $18,200 from the brokerage firm of McGlawn & McGlawn. He signed a mortgage on his home as security for loan. While Williams' loan application form indicated that the fixed interest rate was 17.990% (Exs. 46 & 47), the TILA disclosure statement revealed an interest rate of 20.243%. (Ex. 51). According to the terms of this loan, Williams owed Gelt 179 monthly payments of $274.14 each beginning February 1, 1998 and one balloon payment of $17,305.84 on January 1, 2013. (Ex. 51). Within two days of accepting the loan, Williams called the brokerage firm to rescind it because of the high interest rate. Nevertheless, a McGlawn & McGlawn employee subsequently visited Williams' home and gave him copies of eight checks totaling $6,211.31 that were issued to Williams' creditors and one check for $4,854.20 for his personal use.

In February, 1998, Williams contacted McGlawn & McGlawn, informing the firm that he had lost his job and could not make the loan payments. The broker offered to give Williams a "new loan" at a lower interest rate. (Bankr.Op. at 7). The parties agree that this loan ("the second transaction"), which was completed on February 20, 1998, paid off or superseded the first transaction. Upon accepting the second loan, Williams returned the check for $4,854.20 given to him in connection with the earlier transaction. The principal on the second loan remained $18,200 and was also secured by a mortgage on Williams' home. However, the interest rate was reduced to 15.123%. (Ex. 24). Under the terms of this loan, Williams was to pay Gelt $230.13 on a monthly basis beginning April 1, 1998 and one balloon payment of $16,672.22 on March 1, 2013.

Williams made no payments on the second loan. In a letter sent to Gelt on June 23, 1998, Williams' attorney stated that he was rescinding both transactions because Gelt had violated TILA by failing to disclose accurately the financed amount, the finance charge, and the annual percentage rate. Gelt did not respond to Williams prior to the suit filed in the bankruptcy court.

The bankruptcy judge held a trial in late February, 1999. He concluded that Gelt had committed three distinct violations of TILA and the Home Ownership and Equity Protection Act, 15 U.S.C. § 1639, in connection the first transaction. First, Gelt failed to provide Williams with the required disclosure statement at least three days before the first loan transaction was consummated in violation of §§ 1638(a) & (b), 1639(b)(1). Second, Gelt improperly included a pre-payment penalty in the first loan in violation of § 1639(c)(1)(A). Third, Gelt took a security interest in Williams' home, rent, fixtures and appliances without full disclosure in violation of § 1638(a)(9)(B). Under the

statute, Williams was entitled to a single recovery of double the finance charge, with a minimum of $200, and a maximum of $2,000 for the combination of the three TILA violations. *See* § 1640(a) & (g).[1] The bankruptcy judge awarded Williams $2,000.

The bankruptcy judge also found TILA violations in connection with the second loan. He held that Gelt failed to provide Williams with disclosure statements in violation of § 1638 and a notice of his right to rescind in violation of § 1635(a). Furthermore, by failing to respond to Williams' rescission request, Gelt disregarded the procedure outlined in § 1635(b). As a result, Williams was awarded $2,000 for the disclosure violations and $2,000 "for failing to properly respond to the Debtor's valid rescission of the Second Transaction." (Bankr.Op. at 35). The judge also terminated Gelt's security interest in Williams' home pursuant to § 1635(b).

Finally, he ordered Gelt to pay Williams' reasonable costs and attorneys' fees. *See* § 1640(a)(3). Gelt challenges this and all of the above rulings.

TILA was enacted in 1968 to "aid the unsophisticated consumer so that he would not be easily misled as to the total costs of financing." *Thomka v. A.Z. Chevrolet, Inc.,* 619 F.2d 246, 248 (3d Cir.1980). Consequently, it is not surprising that courts have held that "TILA, as a remedial statute which is designed to balance the scales, 'thought to be weighed in favor of lenders,' is to be liberally construed in favor of borrowers." *Smith v. Fidelity Consumer Discount Co.,* 898 F.2d 896, 898 (3d Cir. 1990) (citation omitted). Nonetheless, finding that TILA's protections were still inadequate, Congress added the protections and requirements of the Home Own-

ership and Equity Protection Act ("HOEPA") in 1994. 15 U.S.C. § 1639. HOEPA was designed to address the problem of "reverse redlining," that is, the targeting of persons for "credit on unfair terms" based on their income, race, or ethnicity. S.Rep. No. 103–169, at 21 (1993). In an attempt to even the playing field, Congress enacted HOEPA

> to ensure that consumers understand the terms of such loans and are protected from high pressure sales tactics [.] . . . [T]he legislation requires creditors making High Cost Mortgages to provide a special, streamlined High Cost Mortgage disclosure three days before consummation of the transaction. The bill also prohibits High Cost Mortgages from including certain terms such as prepayment penalties and balloon payments that have proven particularly problematic.

*Id.*

 Gelt asserts that the bankruptcy judge committed legal and factual error when finding that Gelt did not provide disclosures to Williams at least three days prior to the first high cost loan transaction as required by § 1639(b)(1).[2] According to Gelt, Williams signed and dated the necessary disclosures on December 11, 1997, six days before the loan transaction. If true, this was sufficient to prove that Gelt complied with the statute. (Ex. 51). Under § 1635(c), however, "written acknowledgment of receipt of any disclosures . . . does no more than create a rebuttable presumption of delivery thereof." This presumption may be rebutted by the "testimony of a debtor" that the disclosures were not given, "even where a disclosure statement is produced." *Pinder v. Lomas & Nettleton Co.,* 83 B.R. 905, 913 (Bankr.E.D.Pa.

---

**1.** Section 1640(g) provides in part, "The multiple failure to disclose to any person any information required under this part . . . shall entitle the person to a single recovery under this section. . . ."

**2.** Under § 1602(aa)(1), the disclosure requirement relates to high cost loans secured by the

debtor's home. High cost loans have an annual percentage rate which is 10% or more above the corresponding treasury rate and/or up-front fees equal to 8% or more of the amount loaned. The parties agree that these loans were high-cost loans as defined in this section.

1988). Once the debtor has provided an affidavit or testimony that he or she did not receive the documents, "it is incumbent upon the ... [creditor] to produce some positive evidence that delivery" of the documents occurred. *Stone v. Mehlberg*, 728 F.Supp. 1341, 1354 (W.D.Mich.1989).

During the trial, Williams testified that he did not receive any documents from Gelt before going to the offices of McGlawn & McGlawn on December 17, 1997. In addition, the following exchange occurred between Gelt's attorney and Williams during the trial:

Q: Mr. Williams, please take a look at Gelt 51 [a loan document containing the disclosures required by TILA]. Do you recognize that document?

A: I recognize the document. I recognize my signature.

Q: All right. Mr. Williams, do you also recognize the date?

A: No, I don't recognize the date.

&ast; &ast; &ast;

Q: Well, is that your writing on there?

A: It's my signature.

Q: How about the date, did you write that in?

A: No, I didn't write—I didn't write that in.

(Tr. at 11–12).

The bankruptcy judge found credible Williams' testimony that he did not date the form on December 11, 1997 and that he did not receive the disclosures before December 17, 1997. He was in the best position to assess the witness's veracity. Accordingly, we conclude that the bankruptcy judge's factual finding was not "clearly erroneous." *In re Siciliano*, 13 F.3d at 750. Accepting this testimony as true, Williams has sufficiently rebutted the § 1635(c) presumption that the disclosure document was delivered to him at least three days before the loan was made. Gelt relies solely on that one piece of evidence—the form dated December 11, 1997. In sum, Gelt has not met its burden

that it sent or otherwise provided the appropriate disclosure to Williams on December 11, 1997 or at any time before he accepted the loan. For these reasons, we will uphold the bankruptcy judge's finding that Gelt violated § 1639(b)(1) by not supplying Williams with the disclosures for the first transaction in a timely fashion.

■ Next, Gelt argues that the bankruptcy judge erred by ruling that the "1–4 Family Rider" accompanying the first transaction created a security interest which Gelt should have specifically disclosed. (Ex. 10). The disclosure statement given to Williams for the first transaction lists the secured property as "real property" and identifies Williams' home at 5169 Heston Street in Philadelphia. (Ex. 12). On the other hand, the "1–4 Family Rider" which "is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed ...," refers to the secured property not only as 5169 Heston Street, but also as any future rents from that property, and .

A. ... building materials, *appliances and good of every nature whatsoever* now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus .... (emphasis added).

Clearly, the rider's definition of secured property encompasses significantly more items than the disclosure statement's description. For this reason, the bankruptcy judge held that the disclosure statement violated § 1638(a)(9) of TILA which requires creditors to provide "a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type."

■ Confronted with similar situations, other courts have found a TILA violation

when there is "an obvious discrepancy between the disclosures provided to the borrower and the security interest granted in the mortgage instrument." *Searles v. Clarion Mort. Co.*, Civ.A. No. 87–3495, 1987 WL 61932 at *5 (E.D.Pa. Dec. 7, 1987); *Gambale v. Lomas & Nettleton Co.*, 80 B.R. 308, 308 (E.D.Pa.1987). *See also Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 221–22, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981). Furthermore, the borrower does not need to prove that he or she was misled or suffered actual damages as a result of the violation. *See Griggs v. Provident Consumer Discount Co.*, 680 F.2d 927, 932 (3d Cir.), *vacated on other grounds*, 459 U.S. 56, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982).

The facts in *Gambale* are virtually identical to those in the case before us. There, the creditor provided the borrower with a disclosure statement indicating that "[t]he security of this obligation is 2004 S. Norwood St., Phila., PA. 19145." In addition to the home, the mortgage included fixtures in the dwelling and any future rents from the home in the description of the secured property. *Gambale*, 80 B.R. at 309–10. The court found that defendant violated TILA because "the disclosures fail to jive with the security actually taken in the mortgage." *Id.*

Similarly, in *Searles*, the disclosure statement related to financing for plaintiff's real estate acquisition identified the security as "The Goods or Property Being Purchased." *Searles*, 1987 WL 61932 at *2. The mortgage document, however, also gave the mortgage company a security interest in

> [A]ll and singular Buildings and Improvements on said premises, as well as all alterations, additions or improvements now or hereafter made to said premises, *and any and all appliances, machinery, furniture and equipment (whether fixtures or not) of any nature whatsoever* now or hereafter installed in or upon said premises.... (emphasis added).

*Id.* The *Searles* court concluded that the discrepancies violated TILA "which was intended to protect consumers from the hidden finance charges and security interests." 1987 WL 61932 at *5.

Gelt offers two reasons why the analysis of *Searles* and *Gambale* should not apply to the present case. First, Gelt argues that because Williams never rented his house, there was no property interest in which a security interest could attach. This theory ignores the fact that the mortgage granted a security interest in fixtures and appliances as well as rents. Moreover, it is Gelt's incomplete disclosure statement, not whether actual harm occurred, that drives our analysis. *See Griggs*, 680 F.2d at 932. Whether or not rents accrued is irrelevant. Second, Gelt refers us to Regulation Z, 12 C.F.R. § 226.2(a)(25), which excludes "incidental interests" from the definition of "security interest." Security interest "does not include incidental interests such as interests in proceeds, accessions, additions, fixtures, insurance proceeds (whether or not the creditor is a loss payee or beneficiary), premium rebates, or interest in after-acquired property." 12 C.F.R. § 226(a)(25). This regulation does not advance Gelt's cause. In addition to rents and fixtures, the "1–4 Family Rider" grants Gelt security interest in "appliances and good of every nature whatsoever" present in Williams' home. (Ex. 10). These items are not excluded by Regulation Z and were not identified in the disclosure statement. We will affirm the bankruptcy judge's finding that Gelt violated § 1638(a)(9) by providing Williams with an inadequate disclosure statement relating to the security interest.

■ Gelt also objects to the bankruptcy judge's finding of a third TILA violation regarding the pre-payment penalty attached to the first loan. Williams signed a "Prepayment Penalty Rider" and an "Amendment to Note Prepayment Penalty Rider", both of which required Williams to pay Gelt six months' worth of interest at

17.990% for any amount he prepaid over 20% of the principal during the first year of the loan. (Exs. 9 & 10). The bankruptcy judge held that these provisions of the loans violated

§ 1639(c)(1)(A) which provides

A mortgage referred to in section 1602(aa) of this title may not contain terms under which a consumer must pay a prepayment penalty for paying all or part of the principal before the date on which the principal is due.[3]

Gelt's first argument is based on a misreading of the statute. Gelt claims that "TILA does, in fact, preclude prepayment penalties but only for "residential mortgage transactions" as defined in TILA." (Gelt Br. at 5).[4] The parties agree that Williams' loan was not a "residential mortgage transaction" because it did not involve the purchase or construction of a new home. Therefore, Gelt contends that prepayment penalties are permissible. Unfortunately for Gelt, the statute dictates otherwise. Section 1602(aa)(2) forbids a pre-payment penalty for high cost loans secured by the borrower's home *"other than* a residential mortgage transaction...." (emphasis added). Since Gelt's loan to Williams qualified as a high cost loan under the statute, it is clearly covered by the pre-payment penalty prohibition in § 1639(c)(1)(A). (Tr. at 41).

Gelt also relies on the Alternative Mortgage Parity Act ("Parity Act"), 12 U.S.C. § 3801 *et seq.*, in support of its inclusion of a pre-payment penalty. In 1982, Congress passed the Parity Act "to eliminate the discriminatory impact ... upon nonfederally chartered housing creditors" of regulations that permitted "federally chartered depository institutions to engage in alternative mortgage financing." 12 U.S.C. § 3801. An alternative mortgage is one which is not a traditional, fully amortized, fixed rate loan. 12 U.S.C. § 3802(1). Gelt refers us to a regulation promulgated by the Office of Thrift Supervision which reads: "Any prepayment on a real estate loan must be applied directly to reduce the principal balance on the loan unless the loan contract or the borrower specifies otherwise. Subject to the terms of the loan contract, a Federal savings association may impose a fee for any prepayment of a loan." 12 C.F.R. § 560.34. The Parity Act itself, however, does not mention prepayment penalties. In any event, the regulation on which Gelt relies, even if otherwise applicable, cannot supersede HOEPA.

■ As with the first transaction, Gelt criticizes the bankruptcy judge's finding that Williams did not receive the required TILA disclosures under § 1638 in connection with the second transaction despite Gelt's production of an "ACKNOWLEDGMENT OF RECEIPT OF DOCUMENTS" signed by Williams. (Ex. 44). Although he signed several papers to consummate the second loan while in McGlawn & McGlawn's office on February

---

3. Section 1602(aa)(1) reads:
 A mortgage referred to in this subsection means a consumer credit transaction that is secured by the consumer's principal dwelling, other than a residential mortgage transaction, a reverse mortgage transaction, or a transaction under an open end credit plan, if—
 (A) the annual percentage rate at consummation of the transaction will exceed by more than 10 percentage points the yield on Treasury securities having comparable periods of maturity on the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor; or

 (B) the total points and fees payable by the consumer at or before closing will exceed the greater of—
 (i) 8 percent of the total loan amount; or
 (ii) $400.

4. Under § 1602(w),

 [t]he term residential mortgage transaction means a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling.

20, 1998, Williams testified that he had not received any loan documents before he walked into their firm and did not take any with him when he left. The bankruptcy judge found that the recent transaction was "fresh in the Debtor's mind" and that his testimony was "positive" and "unqualified." (Bankr.Op. at 29). As we discussed previously, the presumption of delivery of documents under § 1635(c) may be rebutted by credible testimony "even where a disclosure statement is produced." *Pinder*, 83 B.R. at 913.

Gelt attempted to counter Williams' statement with the testimony of Joan McCartin, a settlement clerk for the title company which handled the financing. She simply stated that it was her "habit" to provide copies of the required documents to the borrower at the loan closing, but could not specifically remember the Williams transaction. (Bankr.Op. at 8). In addition, she could only testify that she "might have" gone to the offices of McGlawn & McGlawn for this transaction. Even if true, this testimony would not establish that Williams received the disclosure documents three days prior to the loan transaction as required by § 1639(b)(1). In any case, we find that the bankruptcy judge's determination that Williams' testimony was credible and that McCartin's testimony did not sufficiently rebut his claim of non-receipt was not "clearly erroneous." *See In re Siciliano*, 13 F.3d at 750.

■ In addition to Gelt's challenge to the bankruptcy judge's findings that he committed TILA violations, Gelt also argues that the court committed error by reclassifying Williams' loan as unsecured without also compelling Williams to return any money paid to him or on his behalf. Gelt argues that the court's ruling was unjust because Williams will be able to avoid repaying most, if not all, of the loan due to his filing for bankruptcy. The statute, however, does not require the outcome Gelt seeks. Under § 1635(b), once a debtor rescinds a loan, he or she is no longer obligated to pay "any finance or other charge." In addition, the creditor's security interest in the debtor's property becomes void. Within 20 days of receiving notice of rescission, the creditor must return any money or property taken from the debtor and "take any action necessary or appropriate to reflect the termination of any security interest created under the transaction." § 1635(b). At that point, if the creditor has given any property to the debtor, the latter must return the property or its monetary equivalent. Section 1635(b) concludes, "[t]he procedures prescribed by this subsection shall apply except when otherwise ordered by a court."

■ We review the bankruptcy judge's decision not to modify § 1635(b) under the "abuse of discretion" standard. *See Zolfo Cooper & Co. v. Sunbeam–Oster Co.*, 50 F.3d 253, 257 (3d Cir.1995). "In bankruptcy proceedings, [the Court of Appeals for the Third Circuit has] . . . determined that an abuse of discretion exists when 'the [trial] court's decisions rests [sic] upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact.'" *In re New Valley Corp.*, 181 F.3d 517 (3d Cir.1999).

■ Gelt complains that the bankruptcy judge abused his discretion by following § 1635(b) and not imposing an additional requirement that the voiding of its security interest is dependent on repayment of the loan. While several courts have "conditioned the creditor's duty to satisfy its lien of record on the obligor's prior tender of the original principal amount of the loan," none suggests that there is a requirement to do so. *See, e.g., In re Buckles*, 189 B.R. 752, 764 (Bankr.D.Minn.1995). The cases cited by Gelt, and others found by this court, simply refer to the court's ability to weigh the equities and modify § 1635(b) when appropriate. *See Williams v. Homestake Mort. Co.*, 968 F.2d 1137, 1142 (11th Cir.1992); *Brown v. Nat'l Permanent Fed. Sav. & Loan Ass'n*, 683 F.2d 444, 449

(D.C.Cir.1982); *Rudisell v. Fifth Third Bank,* 622 F.2d 243, 254 (6th Cir.1980); *In re Apaydin,* 201 B.R. 716, 724 (Bankr. E.D.Pa.1996); *In re Buckles,* 189 B.R. at 764–66. The decision to include such a modification is usually based on the traditional goal associated with rescission of placing the parties in the position in which they would have been had the transaction not occurred. *See, e.g., In re Buckles,* 189 B.R. at 764. However, there are also public policy reasons for following the steps devised by Congress. In *In re Piercy,* for example, the court concluded that "[c]onditioning rescission upon the debtor's payment ... [would] impose[ ] an obligation from which the debtor has been legally freed.... It would be palpably unfair to deny the relief to which a consumer is entitled under TIL[A] because the consumer has also availed himself of bankruptcy relief." 18 B.R. 1004, 1007 (Bankr. W.D.Ky.1982). *See also, In re Pitre,* 11 B.R. 777, 780 (Bankr.N.D.Ill.1981). Of course, whether or not it is equitable to compel the borrower to repay the debt as a condition of voiding the security interest depends on the facts of each case. By referring to his opinion *In re Ralls,* 230 B.R. 508, 521–24 (Bankr.E.D.Pa.1999), the bankruptcy judge revealed that he understood the discretionary nature of § 1635(b). (Bankr.Op. at 35). No evidence has been presented, and we can find none, to suggest that the bankruptcy judge abused his discretion by choosing not to modify the statutory procedures.

We also note that Gelt appears to be arguing that the relief imposed by the court was based on a "clearly erroneous" finding of fact that Williams' home was "unencumbered by liens" such as "taxes, water/sewer and utility charges." (Gelt Br. at 7). The bankruptcy judge, however, did not make such a finding. Instead, he found that Williams' residence was "unencumbered by any mortgages prior to the instant transaction." (Bankr.Op. at 5). In its brief Gelt states that "[w]hen it suits the Court, the Transac-

tions are separate and therefore subject to separate and additional penalties." (Gelt Br. at 8). We disagree with that characterization of the bankruptcy judge's opinion. In any case, Gelt concedes that there were two loans by referring to the "First Transaction," which was "paid in full," and the "Second Transaction," which was a "new loan." (Gelt Br. at 2). TILA damages are awarded per transaction. *See* § 1640(g). Gelt's violations during the first loan were not absolved by refinancing and entering into a second loan. *See Gill v. Mid–Penn Consumer Discount Co.,* 671 F.Supp. 1021, 1026 (E.D.Pa.1987).

 Gelt does not dispute that Williams is entitled to an award of $2,000 for the first transaction if Gelt violated TILA and HOEPA. However, Gelt appears to argue that the bankruptcy judge erred in granting two $2,000 awards for violations relating to the second transaction.

 In this regard, he awarded Williams $2,000 for failing to provide copies of the disclosure statement and notice of the right to rescind and $2,000 for not responding to Williams' rescission. TILA permits damage awards for both disclosure violations and rescission violations. *See Mayfield v. Vanguard Sav. & Loan Ass'n,* 710 F.Supp. 143, 146 (E.D.Pa.1989); *Aquino v. Public Fin. Consumer Discount Co.,* 606 F.Supp. 504, 510–11 (E:D.Pa.1985); § 1640(a). While § 1640(g) only permits one award even if there are multiple disclosure violations in a transaction, it "does not bar any remedy permitted by section 1635 of this title," which refers to rescission of the loan. Damages may be awarded both for the "failure to honor a valid rescission demand" and for the "creditor's failure to rescind voluntarily." *Newton v. United Companies Fin. Corp.,* 24 F.Supp.2d 444, 445 (E.D.Pa.1998). Accordingly, the bankruptcy judge was permitted to grant Williams a statutory damage award both for Gelt's failure to make

the required disclosures and its failure to respond properly to Williams' rescission.

 Gelt further asserts that it should not have been penalized in the amount of $2,000 for each violation in connection with the second transaction. Section 1640(a) provides the formula for calculating damages under TILA:

(2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction,

* * *

or (iii) in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $200 or greater than $2,000 . . . .

Courts have routinely interpreted (2)(A)(iii) to mean the appropriate penalty is double the finance charge up to a maximum of $2,000. *See, e.g., Strange v. Monogram Credit Card Bank,* 129 F.3d 943, 946–47 (7th Cir.1997); *Smith v. Fidelity Consumer Discount Co.,* 898 F.2d 896, 898 (3d Cir.1990).

Williams paid the following charges to Gelt when consummating the second transaction:

| | | |
|---|---|---|
| 1. | Appraisal Resource | $ 100.00 |
| 2. | Prepaid Interest | $ 30.32 |
| 3. | Settlement/Closing Fee | $ 175.00 |
| 4. | Notary Fee | $ 25.00 |
| 5. | Title Insurance | $ 342.00 |
| 6. | Endorsements (title insurance) | $ 125.00 |
| 7. | Recording Fee | $ 45.00 |
| | | $ 842.32 |

Of these fees, 1, 4, 5, and 6 are excluded from the definition of "finance charge" under TILA. *See* 15 U.S.C. § 1605(e). According, we subtract $592.00 from $842.32 for a total finance charge of $250.32. Under § 1640(a)(2)(A)(i), we double that amount for to $500.64. As this is within the $200 to $2,000 range of § 1640(a)(2)(A)(iii), it is the appropriate amount of damages. Therefore, we will reduce each $2,000 award for TILA violations during the second transaction to $500.64. Thus, the proper award for the two violations relating to the second transaction is $1001.28.

 As noted previously, the bankruptcy judge awarded Williams reasonable attorneys' fees and costs and urged the parties to agree upon an amount. *See* § 1640(a)(3). We affirm this ruling. There being no indication that the parties have reached an agreement on this issue, we remand the action to the bankruptcy court to determine the appropriate award.

As a final matter, we feel constrained to comment on the numerous inappropriate statements made by Gelt in its reply brief. While Gelt is welcome to disagree with the bankruptcy judge's rulings, its personal attacks on the judge are completely unacceptable and have no place in a legal brief.