**In re Pauline M. JACKSON, Debtor.**

**Pauline M. Jackson, Plaintiff,**

**v.**

**US Bank National Association Trustee, Cityscape Corporation, Wilshire Servicing Corporation, and Money–Line Mortgage, Defendants.**

**Bankruptcy No. 99–14248DAS.
Adversary No. 99–0910.**

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Feb. 16, 2000.

Irwin Trauss, Philadelphia Legal Assistance, Philadelphia, PA, for Debtor.

David Banks, Philadelphia, PA, for US Bank, N.A. & Wilshire.

Gary McCafferty, Philadelphia, PA, for First Bank, N.A.

Louis Kassen, Cherry Hill, NJ, for Money-Line Mortgage.

Robert Rosenberg, Latham & Watkins, New York City, for Cityscape Corp. in its bankruptcy case.

Edward Sparkman, Philadelphia, PA, Chapter 13 Trustee.

Frederic Baker, Ass't U.S. Trustee, Philadelphia, PA, United States Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant proceeding ("the Proceeding") is the latest in the series of proceedings by debtors that have come before us alleging, primarily, violations of the Home Ownership Equity Protection Action ("HOEPA") amendments to the federal Truth in Lending Act, 15 U.S.C. §§ 1601, *et seq.* ("the TILA") in oppressive loan transactions. *See In re Murray,* 239 B.R. 728 (Bankr.E.D.Pa.1999); and *In re Williams,* 232 B.R. 629 (Bankr.E.D.Pa.), *aff'd as corrected,* 237 B.R. 590 (E.D.Pa. 1999). *Cf. In re Ralls,* 230 B.R. 508 (Bankr.E.D.Pa.1999) (involved transaction similar to the foregoing, but not within the scope of HOEPA). Although the several defendants herein combine to present a more elaborate defense than the defendants in those prior cases, the result that

we reach is basically the same as we reached in *Murray* and *Williams*. Applying the *Williams* standards, 232 B.R. at 639–41, for determining whether the instant Debtor in fact received necessary disclosures, here the requisite HOEPA pre-closing disclosures, we conclude that she did not. This conclusion triggers application of 15 U.S.C. § 1641(d), the unique HOEPA damages provision which we analyzed in *Murray*. Applying our *Murray* analysis, 239 B.R. at 733–36, we conclude that the Debtor's liability on the loan is eliminated and that she is entitled to damages of $3800.

The pendency of a settlement whereby Defendant MONEY–LINE MORTGAGE ("MLM") agreed to pay the Debtor $4400 for a release of its liability, plus cross-claims between Defendant U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE ("USB") and MLM prompt us to pause before finally resolving any issues in the Proceeding except the Debtor's rights arising from the instant transaction. The determination of the Debtor's rights, which we do resolve, appears to be all that is necessary to complete the long-outstanding confirmation process in the Debtor's main Chapter 13 bankruptcy case.

## B. PROCEDURAL AND FACTUAL HISTORY

PAULINE M. JACKSON ("the Debtor") filed the underlying individual Chapter 13 bankruptcy case on April 2, 1999. Defendant WILSHIRE SERVICING CORPORATION ("Wilshire") filed a secured proof of claim on behalf of USB dated May 18, 1999, in the Debtor's main bankruptcy case in the amount of $27,796.81. On July 22, 1999, FIRST BANK, N.A. ("1st Bank"), as Trustee under a pool of mortgages held by Defendant CITYSCAPE CORPORATION ("Cityscape"), filed a motion ("the Motion") seeking relief from the automatic stay to proceed to foreclose the same mortgage as that apparently now held by USB against the Debtor's residence at 1944 East Castor Avenue, Philadelphia, PA 19134 ("the Home").

The Motion was first listed for a hearing on the first date set for confirmation of the Debtor's Chapter 13 plan, August 17, 1999. It was reported, at a continued hearing on the Motion, as well as at the continued confirmation hearing, on September 14, 1999, that the Debtor intended to file the Proceeding relative to the claim of USB/1st Bank/Cityscape. We entered an order continuing, until October 28, 1999, the hearing on the Motion for the last time, the continued confirmation hearing, and the trial on the Proceeding, which we directed to be filed by September 20, 1999.

The Debtor inexplicably delayed in filing the Proceeding until October 7, 1999, and scheduled it for trial on November 23, 1999. On October 28, 1999, we were advised that the Motion was settled, although no stipulation memorializing this settlement has ever been filed and a hearing to show cause why the Motion should not therefore be dismissed pursuant to Local Bankruptcy Rule 7041–2 is scheduled on March 9, 2000.

The confirmation hearing was also continued to November 23, 1999, at which time the trial of the Proceeding was continued on a must-be-heard basis until December 16, 1999, with the confirmation and a hearing on a motion of the trustee to dismiss this case for lack of payments and plan infeasibility.

On November 4, 1999, MLM filed an Answer to the Complaint in the Proceeding including a cross-claim against the other defendants. On December 3, 1999, USB and Wilshire filed a joint answer including a cross-claim against Cityscape and MLM. Cityscape filed no pleadings and, on December 10, 1999, the Debtor filed a praecipe for entry of a default against Cityscape.

Apparently just prior to the trial it was discovered that Cityscape had filed a Chapter 11 Bankruptcy in the Southern District of New York. A last minute mo-

tion to continue the trial in light of this development was denied, and the trial went forward on December 16, 1999. The Debtor's confirmation hearing and the TMTD were scheduled on February 3, 2000, but have now been continued until March 2, 2000.

After the trial the parties were accorded the opportunity to simultaneously submit opening briefs by January 14, 2000, and reply briefs by January 24, 2000.

The Complaint attacks Wilshire's proof of claim, alleging that the Complaint itself effects a demand for, *inter alia*, rescission under HOEPA and the TILA, of the underlying loan transaction of March 18, 1997, between the Debtor and MLM, which was initially assigned to Cityscape and ultimately to USB, whose servicing agent is Wilshire. The Complaint also includes claims pursuant to 11 U.S.C. § 506 and for breach of contract, and further invokes the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201–1, *et seq.* (referenced here by its generic designation as a law regulating *u*nfair and *d*eceptive *a*cts and *p*ractices, *i.e.*, "UDAP"); the Pennsylvania Home Improvement Finance Act, 73 P.S. §§ 500–101, *et seq.* ("HIFA"); the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691, *et seq.* ("ECOA"); and the Real Estate Settlement Procedure Act, 12 U.S.C. §§ 2601, *et seq.* ("RESPA").

Because the Defendants do not contest that this is a HOEPA loan, the principal issue before us is whether there was a HOEPA/TILA violation triggering the Debtor's right to rescind the loan. In the event we find such a violation, we must then determine the remedies available to the Debtor in light of the HOEPA assignee provision, 15 U.S.C. § 1641(d). These are the only issues which directly affect the Debtor and are all that are resolved at this time. Remaining for disposition is approval of a proposed Stipulation fixing the Debtor's damages against MLM at $4400 and determining the effect of the instant decision and this Stipulation on the Defendants' respective cross-claims.

The Debtor's trial testimony revealed that she is a 39–year–old widow who is residing in the Home, which she purchased with her late father in 1983, with five dependent children. The Home was purchased at the price of $21,500, and, in the course of at least two prior bankruptcy cases pending between 1989 and the mid–1990's, the mortgage loan taken to originally finance the Home's purchase was liquidated.

The Debtor testified that the instant transaction was initiated, after the original Home mortgage was liquidated, by a telephone call made to her by All Star Remodeling Co., Inc. ("All Star") soliciting her for home-improvement work. The Debtor responded that the Home needed new windows and she discussed having this work done with a representative of All Star. The Debtor testified that, after an estimate of over $3300 for the total cost for the work to be done was presented to her, she told the All Star representative that she could not afford the cost and believed she would not be able to procure a loan due to her previous bankruptcies. The Debtor testified, that, in response, the All Star representative stated that he would get her a loan. Accordingly, he wrote up a contract to supply and install seven (7) windows to the Home at a cost of $3351, dated February 5, 1997, which the Debtor executed.

Shortly thereafter, the Debtor testified that she was contacted by MLM in reference to the loan. After several telephone conversations with an MLM representative, the Debtor was informed that, on March 18, 1997, she was to go to the MLM office in Cherry Hill, New Jersey, where the loan would be consummated.

While she did not appear to recall what precise terms of the loan had been discussed on the telephone prior to her appearance at MLM's offices, the Debtor testified that she received no documents from MLM and did not know the total

amount of the loan, which was $19,000, until she arrived at the MLM office on March 18, 1997. She also testified that she had no contact at any time with any loan broker, including First Clearfield Fund, Inc. ("FCF"), which was ultimately identified as a participant in the transaction.

Present at the loan closing were the Debtor, her fiancé Robert Bannon, and Shirley E. Pimm, Esquire, an attorney whose firm, that of Louis Kassen, Esquire, represented MLM. The loan documents reveal that the transaction contemplated paying off all of the Debtor's outstanding debts as a predicate for her receiving a loan to pay for the home repairs to be done by All Star. The settlement sheet reflected that $14,279.21 of the loan proceeds were used to pay off the Debtor's pending obligations, outstanding debts which totaled $10,633.21, including $2417 to PECO Energy, $2764.21 for delinquent real estate taxes, $3800 for alleged delinquent water and sewer bills, and $1500 escrowed to pay estate taxes due on the estate of the Debtor's late father; and $3,646 to pay fees connected to the loan, including a $950 "origination fee" to FCF, a $950 "loan discount" to MLM, $250 for an appraisal of the Home, $420 for "hazard insurance," $445 for a title search, and $501 in fees to Kassen's law firm. The actual proceeds of the loan amounted to $4,720.79, of which $3,351.00 went to All Star to pay for the windows, with the Debtor receiving a check for the balance of $1,369.79.

The Debtor now disputed the legitimacy of several of the disbursements on her debts. Specifically, she referenced the escrow for her late father's estate taxes, since a tax return in the record fixed this liable at $352.00; and $879 of the payments for water and sewer bills, which she claimed had been discharged in a prior bankruptcy case.

What ultimately became an issue of great significance is the Debtor's receipt of four documents which the Defendants claim are the pre-closing disclosures required by HOEPA, 15 U.S.C. § 1639(b), 12 C.F.R. § 226.32(c): (1) a Regulation Z Section 226.32(c) Disclosure form; (2) a Truth–in–Lending Disclosure (Real Estate) ("the TILA D/S"); (3) a Good Faith Estimate of Borrower's Settlement Costs; and (4) the Notice of Right to Cancel the loan within three days, required by 15 U.S.C. § 1635(a), 12 C.F.R. § 226.23(b). The first three of the four referenced documents contain the typed-in date of March 6, 1997. However, the Debtor testified that she signed and received all of these documents only on March 18, 1997, at the closing.

There was testimony on behalf of the Defendants to the contrary regarding the dispatch of the pre-closing disclosures. Frank James, President of MLM, testified that MLM's office policy was to dispatch the pre-closing disclosures to its customers shortly after applications were made, and that it would have been consistent with this policy to mail the pre-closing disclosures to the Debtor on or about March 6, 1997, the date typed in on the three forms. Pimm, who conducted the settlement, testified that she asked the Debtor at settlement whether or not she had received the required pre-closing disclosures, to which the Debtor allegedly responded that she did, but did not bring them with her. Pimm testified that, as a result, she had the Debtor sign duplicates of the pre-closing disclosures at the settlement.

As the Debtor noted in her post-trial arguments, the Defendants did not present any evidence, such as copies of covering letters, which tended to support the conclusion that the required documents were actually mailed on March 6, 1997, to, and were received by, the Debtor. Both the Debtor and Bannon testified that no documents were received prior to settlement and that the colloquy to which Pimm testified regarding the Debtor's failure to bring these documents with her never occurred.

The TILA D/S recited that the transaction contemplated a consumer loan in the principal amount of $17,100.00, deducting, from the $19,000, the $950 paid to both FCF and MLM as the "origination fee" and "loan discount," respectively. Payments were to be made for 20 years, and included a total finance charge of $36,-322.84 accruing at an annual percentage rate of 14.796%. The terms contemplated payments at the rate of $222.60 monthly and a final payment of $221.44. The total of the payments to be made on account of windows costing about $3351 was therefore $53,422.84!

The note executed by the Debtor in the transaction was assigned by MLM to Cityscape on March 18, 1997, and from Cityscape to USB on June 10, 1998. The parties agreed that the Debtor paid a total of $1800 to Cityscape and/or USB on this loan prior to filing bankruptcy.

While USB/Wilshire and MLM filed their opening briefs in timely fashion, the Debtor's opening brief was not filed until January 18, 2000. In response to USB's motion to strike the Debtor's brief because of its tardy remittance, the Debtor's counsel was fined $50 and the Defendants' time to file reply briefs was extended to January 28, 2000.

In her opening brief, the Debtor focused on the HOEPA/TILA claims that flowed from an allegedly valid but ignored rescission under these statutes, recognizing that 15 U.S.C. § 1641(d), per *Murray, supra,* 239 B.R. at 733–36, would cap the Debtor's total damages and render the other claims superfluous.

As to the HOEPA/TILA claims, the Debtor argued that rescission rights were triggered by MLM's failure to provide the pre-closing disclosures, which she undertook to prove could not have been prepared nor therefore provided on March 6, 1997, because the loan terms changed slightly thereafter, raising the total amount of the loan from $18,500 to $19,-000. Alternatively, she argued at length that the notices purportedly provided did

not in any event contain the proper disclosures. The Debtor therefore asserted that she is entitled to the relief accorded to the *Murray* debtor, 239 B.R. at 734–37, as a result of a valid but ignored TILA rescission, in an oppressive HOEPA loan, *i.e.,* statutory damages for $2000 under 15 U.S.C. § 1640(a)(2)(A)(ii) against USB and Wilshire for refusing her valid rescission; elimination of USB's security interest in the Home; elimination of USB's claim; return of the $1800 paid by her on the loan; and reasonable attorneys' fees and costs.

The Defendants all conceded in their submissions that the loan at issue was within the scope of HOEPA. USB/Wilshire, in their opening brief, nevertheless argued, first, that Wilshire never owned the loan and was wrongfully sued by the Debtor. They next claimed that the Debtor was barred from raising any claim in connection with the HOEPA notice by the statute of limitations contained in 15 U.S.C. § 1640(e), which they, unlike the *Murray* defendant, pleaded. They further claimed that, as they were twice-removed assignees of MLM, they could not possibly have known of any TILA violations in the loan transaction, such as any failure of MLM to send the pre-closing disclosures. Therefore, they contended that, pursuant to the terms of 15 U.S.C. § 1641(a), they were protected by the fact that there were no material violations on the face of the TILA D/S given by MLM to the Debtor. MLM echoed USB/Wilshire's statute of limitations defense and denied any liability under any statutes, while noting its settlement with the Debtor for $4400.

The Debtor, in her reply brief, reiterated that USB was subject to all of her claims and defenses pursuant to 15 U.S.C. § 1641(d), and argued that 15 U.S.C. § 1640(e) did not offer any protection to USB from statutory damages for failing to properly respond to her purported rescission. The Debtor did not address how Wilshire, which is merely the servicing

agent of USB and not an assignee to the loan, could be held liable.

USB/Wilshire, in their reply brief, reiterated their belief that there is sufficient evidence that the pre-closing disclosures were timely sent, implying that the Debtor is a veteran of bankruptcy litigation whose general credibility is therefore in doubt. Still sounding the note that their status as assignees affected their liability, they claimed that, in any event, their damages should be limited to a "refund of finance charges and interest paid by the debtor and a rescission of the mortgage," and that any further liability was attributable solely to MLM.

MLM, in its reply brief, argued that it sold the loan to Cityscape without recourse and that USB and Wilshire, as Cityscape's assignees, had no right to any indemnification or contribution against it.

## C. DISCUSSION

1. *Since We Find that the Debtor Failed to Receive the Requisite HOEPA Pre–Closing Disclosures, the Debtor Is Entitled to Rescind the Instant Loan.*

All of the parties agreed that this transaction involved a HOEPA loan. Therefore, what must be decided is whether MLM violated HOEPA or committed other violations of the TILA justifying rescission and, if so, what damages result and which parties can be held accountable to the Debtor therefor. Liabilities of the Defendants *inter se* appear to be issues beyond the jurisdiction of this court, *see, e.g., In re Summit Airlines, Inc.,* 160 B.R. 911, 921–24 (Bankr.E.D.Pa.1993) (bankruptcy court lacks subject matter jurisdiction over nondebtors' third party complaints against other nondebtors), and have no apparent bearing on the important issue of getting the underlying bankruptcy case of the Debtor to confirmation.

■ We conclude that we can most easily resolve the issues presently before us for disposition by finding, as we do, that the Debtor was not provided with the requisite pre-closing HOEPA disclosures.

■ As we established in *Williams, supra,* 232 B.R. at 639–41, the Defendants' production of copies of the disclosures that were signed by the Debtor on the settlement date stating that she received the pre-closing disclosures in timely fashion fail to conclusively establish that the disclosures were in fact provided in the face of the Debtor's credible testimony, supported by that of Bannon, that they were not. Pursuant to 15 U.S.C. § 1635(c), "written acknowledgment of receipt of any disclosures...does no more than create a rebuttable presumption of delivery thereof." This presumption may be rebutted by the "testimony of a debtor that the disclosures were not given, even where a disclosure statement is produced." *In re Pinder,* 83 B.R. 905, 913 (Bankr.E.D.Pa.1988). Once the Debtor has provided an affidavit or testimony that he or she did not receive the documents, "it is incumbent upon ... [the creditor] to produce some positive evidence that delivery" of the documents occurred. *Williams v. Gelt Financial Corp.* 237 B.R. 590, 595 (E.D.Pa.1999), citing *Stone v. Mehlberg,* 728 F.Supp. 1341, 1354 (W.D.Mich.1989).

Contrary to USB's arguments on this score, we find that the Debtor, despite her experience in prior bankruptcy litigation, remains an archetypical unsophisticated low-income consumer who, when solicited apart from her counsel, was prey to overreaching financial institutions. As we noted in *Williams, supra,* 232 B.R. at 635, 642; and *Ralls,* 230 B.R. at 513–14, 523, and was true in *Murray* as well, no sophisticated homeowner would impose a $27,000 high-interest mortgage against their home simply to obtain financing for windows costing about $3350. The cumulation of charges and fees upon the Debtor renders the entire transaction properly characterized as an exercise in equity-stripping.

The testimony given on behalf of MLM by its president James was of no greater

weight than that of Joan McCartin, the lender's "closing agent" in *Williams*, 232 B.R. at 634, that it was the "habit" or customary practice of the lender to provide disclosure documents to its customers. Unlike McCartin, James did not even attend the settlement, nor did he provide any documentary evidence tending to support the hypothesis that the pre-closing disclosures were provided. The instant Debtor, while equally as "positive, unqualified, and . . . candid," as the *Williams* debtor, 232 B.R. at 641, in her denials of receipt of the pre-closing disclosures prior to the actual date of closing, was not aged and somewhat confused, as was the Williams debtor. Also, her testimony is totally supported by the testimony of Bannon. *Compare Murray, supra,* 239 B.R. at 730–31 (the Debtor and his wife gave significantly different versions of how they received the loan documents in question).

We find that Pimm, who was present at settlement and exhibited powers of recall too specific to be believable, in contrast to McCartin in the *Williams* case, was therefore not nearly so credible as the Debtor and Bannon in their denials of Pimm's testimony that the Debtor told her that she (the Debtor) had received the pre-closing disclosure documents but that she simply did not bring them with her to the closing, and therefore duplicates of the earlier disclosures were provided. We find it more likely that Pimm's testimony is wishful thinking that such an occurrence took place or an outright fabrication.

We are also led to accept the version of the Debtor and Bannon as opposed to Pimm by review of the documents. All of the dates on the documents, and specifically the March 6, 1997, dates, are typed rather than written in by the Debtor. This format makes putting in a false, earlier date on a document given at a late time easy to accomplish.

Finally, the Debtor presents an elaborate, but ultimately convincing, analysis of the preparation of the various pre-loan documents which strongly supports the conclusion that the pre-closing disclosure documents were not prepared, and hence could not have been produced, until at or about the closing.

James testified that MLM generally sends out the pre-closing disclosures upon preapproval of the transaction by the investor, in this case Cityscape. The required documents would then contain the pre-approved amounts. The instant record indicated, however, that the loan amount pre-approved by Cityscape on March 6, 1997, and was for $18,500.00, half the value of the preliminary estimate of the value of the Home of $37,000, in accordance with MLM's ordinary practices.

On March 12, 1997, MLM received an appraisal of the Home at $38,000. Jones admitted that the loan amount was "probably" increased to $19,000 on the basis of this appraisal, The Debtor also noted that, as late as March 16, 1997, MLM ordered hazard insurance which contemplated an $18,500 loan.

The alleged pre-closing disclosures all designated the amount of the loan as $19,000, not $18,500. While the difference in the loan amount is not very significant in and of itself, we agree with the Debtor that it was most unlikely that documents actually prepared on March 6, 1997, would have predicted the ultimate $19,000 loan amount that was not developed until at least March 12, 1997. We find that this analysis convincingly supports the Debtor's testimony that the alleged pre-closing disclosures were not prepared until well after March 6, 1997, and were therefore, as the Debtor testified, not provided to her until the closing on March 18, 1997.

The rejoinders to these arguments of the Debtor by USB/Wilshire, though submitted in a reply brief prepared after both of the Debtor's submissions as an aspect of sanctions for her late-filed opening brief, were very weak. We are asked to believe Pimm because she is not a party to the litigation, although her law firm is representing a party, and because USB believes,

contrary to the record, that her testimony was not "refuted," although neither the Debtor nor Bannon related any conversation with Pimm about the Debtor's prior receipt of the pre-closing disclosures. USB also contended that it is inconsistent for the Debtor to purportedly argue that she received disclosures concerning an $18,500 loan and that she received no pre-closing disclosures at all. Of course, the Debtor is *not* arguing that she received disclosures in reference to an $18,500 loan. Rather, she contended only that documents obtained by her counsel from MLM in pre-trial discovery revealed that the loan was originally fashioned for that amount and that, since the loan amount was not fixed at $19,000 until well after March 6, 1997, she could not have possibly received any disclosures for a loan reciting the $19,000 amount on March 6, 1997.

■ We therefore conclude that the Debtor did not receive the pre-closing disclosures required by HOEPA. This violation of HOEPA/TILA constituted a material violation of the TILA, *see* 15 U.S.C. §§ 1602(u), 1639(a), 12 C.F.R. § 226.23(a)(3) n. 48, entitling the Debtor to rescission of the transaction.

We also note that the failure to provide these pre-closing disclosures appears to be a prevalent practice in the industry. *See Murray, supra,* 239 B.R. at 730–31 (creditor concedes disclosures not given); and *Williams, supra,* 232 B.R. at 635 (no defense presented on issue of whether such disclosures were in fact provided).

We need not consider the Debtor's persuasive alternative arguments that the added charges for the inheritance tax escrow, unowed water charges, insurance charges where the Debtor had no opportunity to purchase same elsewhere, *see In re Moore,* 117 B.R. 135, 138–41 (Bankr. E.D.Pa.1990), *aff'd,* 1991 WL 146241 (E.D.Pa. July 25, 1991), and fees to Kassen's firm were properly classifiable as undisclosed finance charges which rendered the disclosure of the finance charge and the annual percentage rate on the TILA D/S inaccurate. We also could address the subject of FCF's charges, since we find the testimony of Jules Clearfield that the Debtor hired his firm and authorized his charges far less credible than the testimony of the Debtor that she had no contacts with FCF at any time. However, the Debtor made no arguments on this point in her lengthy briefs. *See In re Main, Inc.,* 239 B.R. 281, 295–96 (Bankr. E.D.Pa.1999) (claims not pursued in lengthy post-trial briefing will be deemed waived). We do find that these aspects of the loan, *i.e.,* adding charges which dwarf the Debtor's liability to pay for the window-purchase which gave rise to the loan in the first place, add to the aura of this loan, as in the case of the loans at issue in *Murray, Williams,* and *Ralls,* as the product of gross over-reaching by lending instructions to the detriment of an unsophisticated borrower.

2. *The Debtor Is Entitled to Damages of $3800 Against USB and MLM, Although We Will Refrain From Deciding the Effect of the Debtor's Settlement with MLM and the Liability of the Defendants to Each Other.*

In light of our finding that the instant transaction is a HOEPA loan, we note that the damage calculation is controlled by 15 U.S.C. § 1641(d), as we held in *Murray, supra,* 239 B.R. at 733–37.

■ One issue distinct from any presented in *Murray* is whether Wilshire, as the servicing agent for USB, has any liability to the Debtor. We find that Wilshire cannot be held liable because the TILA has no provision for liability for servicing agents, as the statute has for original lenders and their assigns. No specific facts or statutory bases for rendering Wilshire liable appears, since there is no evidence that its duties as a servicing agent have anything to do with the facts which render USB and MLM liable to the Debtor.

■ Second, we address the defense of the statute of limitations appearing in 15 U.S.C. § 1640(e). While the limitation defense bars an affirmative recovery of damages under 15 U.S.C. § 1640(a)(2) for disclosure violations in a 1997 transaction, it does not bar such damages for the separate refusal to honor the Debtor's valid rescission arising from the transaction, which occurred when USB refused to effect a rescission upon receipt of the Complaint's containing a demand for same within the twenty (20)-day period of 15 U.S.C. § 1635(b). *See Ralls, supra,* 230 B.R. at 522; and *In re Tucker,* 74 B.R. 923, 932 (Bankr.E.D.Pa.1987), and cases cited therein. The statutory damages under § 1640(a)(2)(A)(iii) for the failure to recognize this valid rescission amount to $2000 here because the finance charge in the transaction exceeds 36,000. *See Murray, supra,* 239 B.R. at 734. USB, as the party holding the loan papers which refused to honor the Debtor's valid rescission, is clearly liable to the Debtor in that amount.

Also bearing on the liability of USB is 15 U.S.C. § 1641(d), which provides as follows:

(d) *Rights upon assignment of certain mortgages.*

(1) Any person who purchases or is otherwise assigned a mortgage referred to in [HOEPA] shall be subject to all claims and defenses with respect to that mortgage that the consumer should assert against the creditor of the mortgage, unless the purchaser or assignee demonstrates, by a preponderance of the evidence, that a reasonable person exercising ordinary due diligence, could not determine, based on the documentation required by this title, the itemization of the amount financed, and ·other disclosure of disbursements that the mortgage was a mortgage referred to in [HOEPA]. The preceding sentence does not affect rights of a consumer under sub-

section (a), (b), or (c) of this section or any other provision of this title.

(2) Notwithstanding any other provision of law, relief provided as a result of any action made permissible by ·paragraph (1) may not exceed—

   (A) with respect to actions based upon a violation of this title, the amount specified in section 130; and

   (B) with respect to all other causes of action, the sum of—

      (i) the amount of all remaining indebtedness; and

      (ii) the total amount paid by the consumer in connection with the transaction.

(3) The amount of damages that may be awarded under paragraph (2)(B) shall be reduced by the amount of any damages awarded under paragraph (2)(A). . . .

■ USB does not deny that it knew that the mortgage which it holds arising out of the instant transaction was a HOEPA loan. In such a loan that is the only defense available to an assignee. *See Murray, supra,* 239 B.R. at 733. As we further held in *Murray,* however, §§ 1641(d)(2) and (3) do limit an assignee's liability to essentially the greater of (1) the applicable TILA damages or (2) elimination of the loan and recovery of all payments made. *Id.*

Therefore, USB,· as the assignee of the loan, can and will be held liable for all of the damages that flow from the statute and for the ignored valid rescission in this HOEPA loan, but no total of damages greater than these set forth in §§ 1641(d)(2) and (3).

■ We have reiterated, in *Murray,* 239 B.R. at 734; *Williams,* 232 B.R. at 643; and *Ralls,* 230 B.R. at 522–24, that the remedies generally available under TILA for valid but ignored rescissions of HOEPA loans include (1) termination of the holder's security interest in the borrower's residence; (2) statutory damages for failing to property respond to the rescission demand; (3) a penalty measured

by recoupment against the remaining unsecured claim on account of the original disclosure violations; (4) elimination of all finance charges; (5) where equitable to do so, elimination of the debtor's entire obligation to the creditor; (6) recovery of all payments made; and (7) recovery of reasonable attorney's fees and costs by the successful borrower's counsel.

■ As in *Murray,* we find that, in addition to $2000 statutory damages, the Debtor is entitled to elimination of the underlying mortgage arising out of this loan, whether held by USB, 1st Bank, or Wilshire. We also find that the Debtor is entitled to elimination of her entire obligation on the mortgage transaction, recovery of all payments made, and recovery of reasonable attorneys' fees and costs by her counsel. We could reach that result either by exercise of our discretion under 15 U.S.C. § 1635(b), *compare Ralls, supra,* 230 B.R. at 523; or, as in *Murray,* 239 B.R. at 734, by considering the payments as an aspect of actual damages under 15 U.S.C. § 1640(a)(1) in light of the gross overcharges imposed upon the Debtor in connection with this loan.

■ As we noted at page 32 *supra,* the instant transaction reeks with the aura of over-reaching by the lenders involved. The Debtor wanted a modest loan to install replacement windows in the Home. What she ended up with was a loan which was secured by all or most of the equity in the previously-unencumbered Home. The goal of the makers of the loan appears to have been the diabolic one of making the loan as large as possible by paying off every conceivable obligation that the Debtor owed and adding in every imaginable charge. In such circumstances, which mirror these in *Murray, Williams,* and *Ralls,* we have no hesitancy in finding "serious over-reaching or improper conduct" by the lenders, *see Ralls, supra,* 230 B.R. at 523, which justifies the full possible measure of potential TILA remedies upon our recognizing a valid but refused TILA rescission.

Granting such complete relief under the TILA renders it unnecessary for us to consider the Debtor's potential additional remedies under HIFA, UDAP, ECOA, or RESPA, since the 15 U.S.C. § 1641(d)(2) limits all claims to the relief we have already granted to the Debtor under the TILA, as was the case in *Murray.* 239 B.R. at 735–36. We do note that the Debtor's joinder of more than just the ultimate assignee lender as defendants did create a better potential for such liability then was presented in *Murray. Compare id.*

There is little doubt that USB, as the holder of the mortgage and accompanying documents, is liable for all of the remedies available to the Debtor. *See id.* We have already held that Wilshire, as USB's servicing agent, is not thereby subject to any liability. *See* pages 32–33 *supra.*

MLM would normally be jointly and severally liable, with USB, for all of the applicable TILA remedies. We are uncertain what the effect of the Stipulation between MLM and the Debtor would have on MLM's liability were it approved. It is unclear, for example, whether the $4400 agreed liability figure is meant to include any award of attorneys' fees and costs to the Debtor's counsel under the TILA. We believe that the only possible resolution at this juncture is to enter judgment against MLM, but make that judgment's enforceability subject to take terms of the Stipulation if and when it is approved.

As to the cross-claims leveled by USB and MLM against each other, we are unable to rule on same at this time for several reasons. First, we question our jurisdiction to ever do so. *See* page 30 *supra.* Second, we believe that we must wait until the Stipulation is approved to determine how the MLM settlement works into the equation. We will therefore schedule a status hearing on all open aspects of the Proceeding, *e.g.,* to determine whether we should approve the settlement stipulation, if we do, to ascertain the precise meaning

of same, and to determine whether we have jurisdiction to hear the cross-claims, at the Debtor's next scheduled confirmation hearing on March 2, 2000. We should also add that we will allow no more than one additional continuance to the Debtor in completing the long-outstanding confirmation process in this case.

## D.   CONCLUSION

An Order consistent with this Opinion will be entered.

### ORDER

AND NOW, this 16th day of February, 2000, after a trial of the above-captioned proceeding ("the Proceeding") on December 16, 1999, at which time the fifth continued confirmation hearing and third continued hearing on the trustee's motion to dismiss this case for lack of payments and plan infeasibility were also listed, and upon consideration of the parties' respective post-trial submissions and the reported settlement stipulation between PAULINE M. JACKSON ("the Debtor") and Defendant MONEY–LINE MORTGAGE ("MLM"), it is hereby ORDERED AND DECREED as follows:

1.   Judgment is entered in the Proceeding in favor of the Debtor against MLM and Defendant U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE ("USB") only in substantial part, as described in the foregoing Opinion.

2.   It is DECLARED that the Debtor properly exercised her right to rescind the parties' loan transaction of March 18, 1997, and that any and all liability of the Debtor to the USB, its agents, and its assigns in that transaction is thereby eliminated. Accordingly, USB is forthwith directed to satisfy any remaining mortgage which it had previously taken against the Debtor's interest in her residential real estate at 1944 East Castor Avenue, Philadelphia, Pennsylvania 19134.

3.   Subject to court approval of the terms of a pending stipulation setting their differences between the Debtor and MLM, MLM and USB are liable, jointly and severally, to pay $3800 to Edward Sparkman, the Standing Chapter 13 Trustee ("the Trustee"), on behalf of the Debtor, as damages pursuant to 15 U.S.C. §§ 1640(a)(1), (a)(2)(A)(iii). The Trustee shall determine whether any of this sum may be claimed as part of the Debtor's exemptions, and, if it may be, he shall forward this sum to the Debtor forthwith.

4.   The continued confirmation hearing and hearing on the trustee's motion to dismiss and a status hearing to determine whether this court should approve the settlement stipulation between the Debtor and MLM and whether we should determine the cross-claims between MLM and USB and any other matters remaining open in the Proceeding is scheduled on

THURSDAY, MARCH 2, 2000, AT 9:30 A.M.

and shall be held in Bankruptcy Courtroom No. 1, Second Floor, 900 Market Street, Philadelphia, PA 19107. It is not anticipated that the confirmation hearing will be continued more than one additional time, since the Proceeding delaying confirmation has now been resolved as to the Debtor.

5.   The parties are urged to attempt to agree upon reasonable attorneys' fees and costs which are due to the Debtor's counsel, pursuant to 15 U.S.C. § 1640(a)(3). If this matter is not resolved by February 28, 2000, the Debtor's counsel may, on that date and not thereafter, file a motion requesting a court award of such fees, said motion to be procedurally in conformity with Local Bankruptcy Rule 2016–3, and list same for a hearing on March 2, 2000, as well. If and only if the Debtor's counsel has made a reasonable request for such fees which is refused, may said counsel recover compensation for time spent in preparing the fee application.